789 So.2d 190 (2000)
Ex parte Robert E. ANDERSON, M.D., and Selma Doctors Clinic, P.C.
(Re Diana Cabaniss, as personal representative of the estate of James Harold Trotter, Sr., deceased; and Annie Ruth Trotter v. Robert E. Anderson, M.D., et al.)
1991564.
Supreme Court of Alabama.
December 22, 2000.
*191 Frank J. Stakely and William H. Webster of Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, for petitioners.
Benjamin L. Locklar of Richard Jordan, Randy Myers & Ben Locklar, P.C., Montgomery, for respondents.
HOOPER, Chief Justice.
Robert E. Anderson, M.D., the defendant in a medical-malpractice action pending in the Dallas Circuit Court, petitions for a writ of mandamus directing the circuit court to vacate its order compelling Dr. Anderson to comply with certain discovery requests and directing it to issue a protective order. We stayed enforcement of the trial court's discovery order pending our review of this petition. We grant the petition in part and deny it in part.
*192 After finding a questionable bump on his forehead in January 1998, James Harold Trotter, Sr., was referred to Dr. Anderson for further consultation. Dr. Anderson, who had previously removed a cancerous tumor from Trotter's forehead, determined that this bump, a squamous cell carcinoma tumor, also needed to be excised. On February 5, 1998, Dr. Anderson performed an outpatient procedure at Four Rivers Medical Center ("Four Rivers"), in which he removed all tissue from Trotter's forehead and scraped all the way down to the bone. Dr. Anderson then performed a skin graft by which he removed skin from under Trotter's forearm and transferred it to the surgical site. At a follow-up appointment a few days later, Dr. Anderson noticed that the skin graft on Trotter's forehead did not seem to be "taking" properly. Because of this failure of the skin graft to adhere properly to the bone, Dr. Anderson scheduled for Trotter a debridement and granulation procedure at Four Rivers in which he would drill holes in Trotter's forehead, which would allow the transferred skin from the graft to grow toward the bone marrow between the inner and outer tables of the skull. During the drilling process, which took place on March 13, 1998, Dr. Anderson drilled through the inner table of Trotter's skull and into the dura (the outermost lining of the brain), resulting in a "gush of serosanguinous fluid (a mixture of cerebrospinal fluid and blood)." A postsurgery CAT scan revealed the presence of air in the intracranial space. Fearing that Trotter would suffer from infection, Dr. Anderson scheduled to have Trotter transferred to another hospital for a neurological evaluation. However, approximately 50 minutes postsurgery, Trotter suffered a serious and debilitating stroke; he was not transferred to the other hospital until two hours later. Because of the stroke, Trotter spent several weeks in the hospital and at a rehabilitation facility. He never fully recovered from the stroke before he died in June 1998.
Trotter and his wife, Annie Ruth Trotter, sued Dr. Anderson and Four Rivers, alleging that Dr. Anderson had breached the applicable standard of care in performing the skin-graft procedure.[1] Annie Ruth Trotter claimed damages for loss of consortium. On Trotter's death, Trotter's daughter Diana Cabaniss, as personal representative of his estate, was substituted as a plaintiff. Cabaniss and Mrs. Trotter (hereinafter referred to collectively as "Cabaniss") made discovery requests to Dr. Anderson, asking for the following:
(1) "copies of all complaints" against Dr. Anderson filed within the five years before March 13, 1998, relating to his ability to perform surgery;
(2) acknowledgment of whether Four Rivers had been given notice of any complaints against Dr. Anderson;
(3) acknowledgment of whether Four Rivers had restricted Dr. Anderson's surgical privileges; and,
(4) acknowledgment of whether Dr. Anderson's "medical, surgical or staff privileges have ever been reviewed, restricted or cancelled by any hospital or by any Medical Licensure Commission *193 in any state in which [he has] been licensed," along with a full explanation of any such actions taken.
In addition, Cabaniss requested the following items from all defendants, including Dr. Anderson and Four Rivers:
(4) a detailed description of "any previous and subsequent incidents from 1990 through the present ... which occurred in substantially the same ... way" as the incident alleged in the complaint or in a similar way; and,
(5) "copies of all notes, memoranda, reports and other documents" reflecting the defendants' knowledge of such "previous and subsequent incidents."
Dr. Anderson filed a response objecting to these requests, based on §§ 22-21-8, 34-24-58, 34-24-59, 6-5-333 and 6-5-551, Ala. Code 1975. Cabaniss eventually moved to compel Dr. Anderson to respond to her discovery requests. On April 4, 2000, the trial court entered an order giving Dr. Anderson 14 days to respond to these discovery requests. Three days later, Dr. Anderson moved to "reconsider" the order compelling discovery or, in the alternative, for a protective order. The trial court held a hearing on the motion to reconsider on April 19, and, on May 3, it entered an order revising its prior order compelling discovery from Dr. Anderson, to provide as follows:
(1) Dr. Anderson must provide complaints related to any debridement surgeries, drilling procedures or skin grafts performed by him within the five years previous to March 13, 1998;
(2) Dr. Anderson must provide information as to whether his medical, surgical, or staff privileges have ever been reviewed, restricted, or cancelled by any hospital or by any Medical Licensure Commission. The trial court stated that the plaintiffs request "does not seek disclosure of documents, but only a written response to the inquiry"; and,
(3) Dr. Anderson must provide information regarding any instances where he drilled too far into a bone and penetrated the skull or dura during a drilling procedure and any instances between 1995 and 1998 when he suffered a delay in transporting or arranging the transfer of a patient to another facility.
The trial court denied other discovery requests Cabaniss had made and denied Dr. Anderson's request for a protective order, except to preclude Cabaniss from sharing information and documents regarding discovery with third parties (except witnesses). Dr. Anderson was given 10 days to comply with the discovery order. He then filed this mandamus petition. We stayed enforcement of the order pending our resolution of the petition.
In his petition for a writ of mandamus, Dr. Anderson presents two issues:
"(1) Whether the trial court erred in compelling discovery of `other incidents' of alleged malpractice committed by Dr. Anderson; and,
"(2) Whether the trial court erred in compelling discovery relating to any review of Dr. Anderson's medical, surgical, or staff privileges."
(See Dr. Anderson's brief to this Court, p. 8.)
This Court stated in Ex parte Pfizer, Inc., 746 So.2d 960 (Ala.1999):
"The writ of mandamus is an extraordinary remedy, and one petitioning for that writ must show `(1) a clear legal right in the petitioner to the order sought; (2) an imperative duty on the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court.' Ex parte Alfab, Inc., 586 So.2d 889, 890 *194 (Ala.1991); see also, Martin v. Loeb & Co., 349 So.2d 9 (Ala.1977); Ex parte Slade, 382 So.2d 1127 (Ala.1980) [overruled on other grounds by Ex parte Creel, 719 So.2d 783 (Ala.1998)]; Ex parte Houston County, 435 So.2d 1268 (Ala.1983); Ex parte Johnson, 638 So.2d 772 (Ala.1994). `Mandamus is an extraordinary remedy and will lie to compel the exercise of discretion, but not to compel its exercise in a particular manner except where there is an abuse of discretion.' State v. Cannon, 369 So.2d 32, 33 (Ala.1979)."
746 So.2d at 962. Disputes regarding discovery matters are an appropriate basis for a petition for a writ of mandamus. See Ex parte Toyokuni & Co., Ltd., 715 So.2d 786 (Ala.1998).

I.
Dr. Anderson contends that the trial court erred in compelling discovery of "other incidents," if any, of alleged malpractice committed by him. Specifically, he argues that discovery of such information is barred by § 6-5-551, Ala.Code 1975.
Section 6-5-551, Ala.Code 1975, states:
"In any action for injury, damages, or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care ... resulting from acts or omissions in providing health care, ... the Alabama Medical Liability Act shall govern the parameters of discovery and all aspects of the action. The plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff and shall include when feasible and ascertainable the date, time, and place of the act or acts. The plaintiff shall amend his complaint timely upon ascertainment of new or different acts or omissions upon which his claim is based; provided, however, that any such amendment must be made at least 90 days before trial. Any complaint which fails to include such detailed specification and factual description of each act and omission shall be subject to dismissal for failure to state a claim upon which relief may be granted. Any party shall be prohibited from conducting discovery with regard to any other act or omission or from introducing at trial evidence of any other act or omission."
(Emphasis added.) By the terms of § 6-5-552, Ala.Code 1975, the Medical Liability Act applies to "all actions against health care providers based on acts or omissions accruing [sic] after June 11, 1987." The term "health care providers" is defined by § 6-5-542(1), Ala.Code 1975, to include medical practitioners and physicians. Because Dr. Anderson qualifies as a physician under the Medical Liability Act and because Cabaniss's action against Dr. Anderson alleging a breach of the standard of care qualifies as an action "accruing after June 11, 1987," § 6-5-551 governs matters of discovery in this particular case.
This Court stated in Ex parte Krothapalli, 762 So.2d 836 (Ala.2000):
"In construing a statute, we must ascertain and give effect to the intent of the Legislature as that intent is expressed through the language of the statute. See BP Exploration & Oil, Inc. v. Hopkins, 678 So.2d 1052, 1054 (Ala.1996). The intent of the Legislature in adopting a statute may be gleaned from considering the language used, the reason and necessity for the statute, and the goals the Legislature sought to accomplish. Id."
*195 762 So.2d at 838. Although in Krothapalli we specifically examined the language of Alabama's peer-review statute, § 22-21-8, Ala.Code 1975, the same principles of statutory interpretation should govern our reasoning as to the statutes at issue here.
We have reviewed the language of the statute, and we conclude that its meaning could not be clearer. If all conditions of the statute are met, then any other acts or omissions of the defendant health-care provider are exempt from discovery, and the discovering party is prohibited from introducing evidence of them at trial. See § 6-5-551. Such exemptions would include information regarding any other incidents regarding Dr. Anderson and his alleged breach of the standard of care.
Our review of Cabaniss's complaint indicates that her complaint fits within the bounds of the statute. Cabaniss specifically detailed the facts and dates regarding Trotter's injury and death and Dr. Anderson's alleged negligence causing Trotter's injury. (Exhibit A to Cabaniss's complaint, included in Dr. Anderson's petition for the writ of mandamus.) Furthermore, the trial court's case action summary sheet indicates that she filed an amended complaint on April 23, 1999, and that the date set for trial was June 12, 2000well within the 90-day limit prescribed by § 6-5-551. (Exhibit G, pp. 2 and 3, as presented in Dr. Anderson's petition for the writ of mandamus.) Thus, Cabaniss appears to have filed a complaint that meets the requirements of § 6-5-551, Ala.Code 1975, and that statute precludes her from obtaining discovery regarding any other medical-malpractice claims that may have been made against Dr. Anderson. In spite of the trial court's attempt to narrowly frame the issue to include only debridements, drillings, or transfers with respect to patients other than Trotter, Dr. Anderson is entitled to the exemption provided by § 6-5-551.
Cabaniss argues that under § 6-5-551 she should not be precluded from obtaining discovery regarding other similar incidents (i.e., other incidents of misperformed drilling procedures, skin grafts, or transfers of patients to other hospitals). Cabaniss argues that she is precluded only from obtaining information regarding any other incidents of malpractice completely unrelated to those alleged in her complaint. (Issue D, Cabaniss's brief to this Court, p. 12.) However, this is not what the statute says. It states that "[a]ny party shall be prohibited from conducting discovery with regard to any other act or omission or from introducing at trial evidence of any other act or omission." § 6-5-551, Ala.Code 1975. (Emphasis added.) See Ex parte Krothapalli, supra, quoting BP Exploration & Oil, Inc., supra. Cabaniss's argument contradicts the plain meaning of the statute.
Cabaniss also argues that under our holding in Ex parte Horton Homes, Inc., 774 So.2d 536 (Ala.2000), Dr. Anderson waived his right to petition this Court for the writ of mandamus because, she says, he waited too long to move for a protective order. The facts of Horton Homes are distinguishable from those in this present case. In Horton Homes, the defendants filed several requests for production along with their May 19, 1999, complaint; Horton Homes responded on July 15, 1999. On August 30, 1999, the defendants filed a motion to compel discovery, citing numerous theories, supported by caselaw, as to why the requested documents were not beyond the scope of discovery and were reasonably calculated to lead to admissible evidence. On September 2, 1999, Horton Homes stated in a one-page response that it stood behind its previous discovery responses and objections, and it requested a *196 full hearing on all issues presented in the motion to compel. On October 14, 1999, the court held a hearing on the motion to compel. After the hearing, but on the same day, the court ordered Horton Homes to produce the requested documents.
On October 27, 1999, Horton Homes moved the court to "reconsider" the October 14 order; "in that motion, for the first time, it offered additional reasons why it considered the requests for production to be beyond the bounds of discovery" and "also asserted, for the first time, that [the plaintiffs'] requests were `overly broad, unduly burdensome, [and] not reasonably limited in time, scope and geographical area.'" 774 So.2d at 538. On October 29, 1999, the trial court denied Horton Homes' motion to reconsider. By the order of October 14, 1999, Horton Homes' response to the plaintiffs' requests for production was due within 21 days from that date, i.e., no later than November 4, 1999. However, Horton Homes did not respond by that date. On November 19, 1999, Horton Homes moved for a protective order, pursuant to Rule 26(c), Ala.R.Civ.P. In its motion for a protective order, Horton Homes articulated the same two arguments it had presented in its motion for reconsideration. However, in further support of its motion, Horton Homes submitted for the first time an affidavit stating that production of some of the documents sought would be unduly burdensome because of the large number of files Horton Homes would have to search in order to comply, and the manner in which those records were kept. The trial court denied the motion for a protective order. Horton Homes then petitioned this Court for a writ of mandamus. We stated:
"In Ex parte Reynolds Metals Co., 710 So.2d 897 (Ala.1998), this Court determined that orders compelling discovery are reviewable by mandamus petition only if the objecting party has properly moved for a protective order pursuant to Rule 26(c), Ala.R.Civ.P....
"Simply put, Reynolds Metals stands for the proposition that a party dissatisfied with the trial court's ruling on a motion to compel discovery must first make a timely motion for a protective order, so as to create a record to support the essential allegation that the petitioner has no other adequate remedy. Id. The motion for a protective order pursuant to Rule 26(c) and any subsequent mandamus petition must be filed within the time period set for production by the trial court in its order compelling discovery. See Reynolds Metals, 710 So.2d at 899 (`Under Rule 26(c), Ala. R.Civ.P., Reynolds may move the trial court for a protective order at any time before the expiration of the 21-day period prescribed in the order compelling discovery.'); see, also, Brittain v. Stroh Brewery Co., 136 F.R.D. 408, 413 (M.D.N.C.1991) (interpreting parallel Rule 26(c), Fed.R.Civ.P., to require that a motion for a protective order be filed in a timely or seasonable manner); Wang v. Hsu, 919 F.2d 130, 131 (10th Cir.1990) (stating that a motion for a protective order is timely if made before the date set for the discovery); United States v. International Bus. Machs. Corp., 70 F.R.D. 700, 701 (S.D.N.Y.1976) (`Such motions under Rule 26(c) must be served before the date set for production'); 8 C. Wright et al., Federal Practice and Procedure § 2035 (1994); Rule 26, Ala.R.Civ.P., cmt. (discussing the federal rule upon which Alabama Rule 26(c) was modeled and citing Wright & Miller, Federal Practice and Procedure § 2035).
"The trial court's October 14, 1999, order allowed Horton Homes 21 days to comply with the plaintiffs' discovery requests. *197 Although Horton Homes filed a motion to reconsider on October 27, 1999, this motion was denied by the trial court on October 29, 1999, and, therefore, did not stay the running of the 21 days. Thereafter, November 4, 1999, the 21st day, came and went without the required production. Horton Homes finally filed a motion for a protective order on November 19, 1999, more than two weeks after the trial court's 21-day period had expired. By not moving for a protective order within the 21-day period, Horton Homes waived its right to a protective order under Rule 26(c); because it waived its right to a protective order, it cannot now show a clear legal right to the relief sought, which is a prerequisite for the issuance of a writ of mandamus. See Ex parte United Serv. Stations, Inc., 628 So.2d 501 (Ala.1993)."
774 So.2d at 539-40.
Horton Homes can be distinguished from this present case. First, in Horton Homes, the trial court apparently held a hearing on the motion to compel and on that same day issued its ruling directing Horton Homes to produce the requested documents. Horton Homes thereafter had the opportunity to file for a protective order within 21 days, as required by the trial court. Second, from the outset, the trial court's order specified the number of days in which Horton Homes had to comply with discovery; it never altered the time or date of compliance. Third, the trial court never altered the scope of the discovery; despite Horton Homes' motion to reconsider and its motion for a protective order, the trial court did not change its decision as to what Horton Homes should be compelled to respond to or what materials it should be made to produce.
This present case can first be distinguished from Horton Homes in that there was a questionable expanse of two months between the time the trial court first wrote its order compelling discovery, the date that order was officially issued, and when Dr. Anderson received it in the mail. On April 4, 2000, the trial court entered, without a hearing, an order dated March 14, 2000, directing Dr. Anderson to respond to discovery within 14 days. However, this order did not specify from what date the 14 days would run. On April 17, 2000, Dr. Anderson filed a motion to reconsider or, in the alternative, for a protective order, and the trial court held a hearing on April 19. On May 3, 2000, the trial court entered an order (dated April 28, 2000) revising its prior order by narrowing the scope of the discovery and directing Dr. Anderson to respond to the requests within 10 days. The order was mailed on May 4 and was received by Dr. Anderson's counsel on May 8. We note that if the 14-day period had begun to run from the date of the order, then the protective order would have had to be filed a week before the order was officially issued and mailed by the trial court. It would be impossible to expect Dr. Anderson to move for a protective order when he and his counsel had not yet received the order in the first place. Therefore, the only reasonable interpretation of the trial court's order is that it did not mean for the 14-day period to begin running until the date the order was received by Dr. Anderson's counsel.
Second, this present case is distinguishable from Horton Homes in that the number of days in which Dr. Anderson had to comply with the trial court's order was altered from 14 days to 10 days. Third, unlike the order in Horton Homes, the order in this case changed the scope of the discovery from the broad discovery allowed by the first order to the narrow discovery allowed when that order was subsequently altered by the trial court. *198 After Dr. Anderson moved for a protective order, the trial court not only denied him the requested protection but also modified his responsibilities for responding to the original order on the motion to compel. Thus, the order from which Dr. Anderson seeks relief here is not the same order from which he sought protection. Furthermore, the trial court, itself, stated in its order on Dr. Anderson's motion to reconsider that the protective order was timely filed. (Exhibit J, Dr. Anderson's petition to this Court.)
The record indicates that Dr. Anderson filed his motion to reconsider the trial court's order compelling discovery or, in the alternative, for a protective order, within 14 days of the date the trial court entered its order compelling discovery and the date his counsel received a copy of the order. Thus, it appears that Dr. Anderson complied with the mandates of Rule 26(c). See Horton Homes, citing Reynolds Metals, supra; see also Brittain, Wang, and International Business Machs. Corp., all cited above in the quotation from Horton Homes. Therefore, the trial court's order compelling Dr. Anderson to comply with Cabaniss's discovery requests regarding incidents of alleged malpractice other than those alleged in her complaint constituted an abuse of discretion. Dr. Anderson is entitled to a writ of mandamus directing the trial court to set aside that order.

II.
Dr. Anderson contends that the trial court erred in ordering discovery on the question whether his medical, surgical, or staff privileges have ever been reviewed, restricted, or canceled by any hospital or medical licensure commission. Specifically, he argues that such information "touches upon" the "other acts or omissions" exempted from discovery under § 6-5-551, Ala.Code 1975. He further contends that such information is protected from discovery under §§ 6-5-333, 22-21-8, 34-24-58, and 34-24-59, Ala.Code 1975. We discuss the amended discovery requests individually and discuss the statutes pertinent thereto.

A.
The trial court's order compelled Dr. Anderson to provide discovery as to any complaints related to any debridement surgeries, drilling procedures, or skin grafts performed by him within the five years previous to March 13, 1998.
Discovery of any incidents of malpractice other than those specifically alleged in the complaint is precluded. As previously stated in Part I of this opinion, § 6-5-551 states in plain language that "discovery with regard to any other act or omission" or the introduction "at trial [of] evidence of any other act or omission" is prohibited.
Despite her argument to the contrary, Cabaniss is not even entitled to learn whether any such "complaints" exist. The mere acknowledgment of whether a complaint was ever filed concerning alleged incidents of malpractice would indeed constitute evidence of prior claims of medical malpractice allegedly committed by Dr. Anderson; this is exactly the kind of information the statute protects from discovery. Therefore, even a simple "yes" or "no" answer to the question whether any complaints against Dr. Anderson had been filed regarding alleged incidents of malpractice other than those that involved Trotter would fall within the prohibition of the statute.

B.
The trial court's amended order compelling Dr. Anderson to respond to discovery included the direction that he provide information as to whether his medical, surgical, or staff privileges had ever *199 been reviewed, restricted, or canceled by any hospital or by any medical licensure commission.
First, we note that discovery of information regarding Dr. Anderson's privileges is barred by § 6-5-333(d), Ala.Code 1975, which states:
"All information, interviews, reports, statements, or memoranda furnished to any committee as defined in this section, and any findings, conclusions, or recommendations resulting from the proceedings of such committee are declared to be privileged. The records and proceedings of any such committees shall be confidential and shall be used by such committee and the members thereof only in the exercise of the proper functions of the committee and shall not be public records nor be available for court subpoena or for discovery proceedings. Nothing contained herein shall apply to records made in the regular course of business by a hospital, dentist, dental auxiliary personnel, chiropractor, chiropractic auxiliary personnel, physician, physician auxiliary personnel, or other provider of health care and information, documents, or records otherwise available from original sources are not to be construed as immune from discovery or use in any civil proceedings merely because they were presented during proceedings of such committee."
The clear import of this statute is that official committee documents, which would include information regarding whether Dr. Anderson's privileges have ever been reviewed, restricted, or canceled, that were prepared in furtherance of the committee's function, are privileged from discovery. However, records made in the regular course of business, exclusive of official committee functions, and otherwise available from their original sources, are discoverable and not privileged. Thus, Cabaniss is not entitled to discover records or documents prepared by a hospital or other health-care provider unless they were prepared in its regular course of business; however, she is not precluded from seeking the same from Dr. Anderson as the original source. Furthermore, according to § 6-5-551, if Cabaniss were to seek the same from Dr. Anderson as the original source, he would be required only to provide her with discovery regarding any review, restriction, or cancellation of privileges that may have occurred specifically in regard to the Trotter incident.
Moreover, the trial court's statement that Cabaniss's request "does not seek disclosure of documents, but only a written response to the inquiry" does not automatically place this kind of discovery outside the scope of the applicable statutes. Section 6-5-551 states that "discovery with regard to any other act or omission" or the introduction "at trial [of] evidence of any other act or omission" is prohibited. The mere acknowledgment of whether complaints were ever filed concerning alleged incidents of malpractice would constitute evidence of "other act[s] or omission[s]," i.e., of other acts of medical malpractice. Thus, to declare "information" not "documents"discoverable to Cabaniss is contrary to the plain meaning of the statute.
Cabaniss's claim to discovery of information and materials pursuant to §§ 22-21-8, 34-24-58, and 34-24-59, Ala. Code 1975, is absolutely barred, regardless of the fact that such information and materials might have been gathered as a consequence of the incident regarding Trotter. Section 22-21-8, Alabama's "peer-review statute," reads:
"§ 22-21-8. Confidentiality of accreditation, quality assurance credentialling materials, etc.

*200 "(a) Accreditation, quality assurance and similar materials as used in this section shall include written reports, records, correspondence, and materials concerning the accreditation or quality assurance or similar function of any hospital, clinic, or medical staff. The confidentiality established by this section shall apply to materials prepared by an employee, advisor, or consultant of a hospital, clinic, or medical staff and to materials prepared by an employee, advisor or consultant of an accrediting, quality assurance or similar agency or similar body and to any individual who is an employee, advisor or consultant of a hospital, clinic, medical staff or accrediting, quality assurance or similar agency or body."
This Court elaborated on the confidentiality of peer-review proceedings in Ex parte Qureshi, 768 So.2d 374 (Ala.2000), in which we determined that the trial court erred in compelling discovery from a physician and hospitals when they were sued by a patient for medical malpractice. That opinion contains a sound statement of the applicable public-policy considerations:
"This Court recently addressed [the confidentiality of hospital and physician information] in Ex parte Krothapalli, 762 So.2d 836 (Ala.2000). We wrote:
"`... Section 22-21-8 was enacted as Act No. 81-801, Ala.Acts 1981. The title to that Act reads: "To provide for the confidentiality of all written materials and activities concerning the accreditation, quality assurance, or similar function of any hospital, clinic, or medical staff."
"`In construing this statute, we adopt the reasoning of the Florida Supreme Court and the South Carolina Supreme Court in the following cases, in which those courts construed peer-review statutes substantially similar to § 22-21-8.
"`In Cruger v. Love, 599 So.2d 111 (Fla.1992), the Florida Supreme Court, construing Florida's peer-review statute, Fla. Stat. Ann. § 766.101(5) (1989), stated:
"`"The Florida Legislature enacted these peer review statutes in an effort to control the escalating cost of health care by encouraging self-regulation by the medical profession through peer review and evaluation. In order to make meaningful peer review possible, the legislature provided a guarantee of confidentiality for the peer review process....
"`". . . .
"`"... While we recognize[] ... that the discovery privilege [impinges] upon the rights of litigants to obtain information helpful or even essential to their cases, we assume[ ] that the legislature balanced that against the benefits offered by effective self-policing by the medical community.
"`"We hold that the privilege provided by [the peer-review statutes] protects any document considered by the committee or board as part of its decision-making process. The policy of encouraging full candor in peer review proceedings is advanced only if all documents considered by the committee or board during the peer review or credentialing process are protected. Committee members and those providing information to the committee must be able to operate without fear of reprisal. Similarly, it is essential that doctors seeking hospital privileges disclose all pertinent information to the committee. Physicians *201 who fear that information provided in an application might someday be used against them by a third party will be reluctant to fully detail matters that the committee should consider."
"`599 So.2d at 113-14. (Citation omitted.)
"`Similarly, the South Carolina Supreme Court, in McGee v. Bruce Hosp. System, 312 S.C. 58, 439 S.E.2d 257 (1993), explained:
"`"The overriding public policy of the confidentiality statute is to encourage health care professionals to monitor the competency and professional conduct of their peers to safeguard and improve the quality of patient care. The underlying purpose behind the confidentiality statute is not to facilitate the prosecution of civil actions, but to promote complete candor and open discussion among participants in the peer review process. ...
"`". . . .
"`"We find that the public interest in candid professional peer review proceedings should prevail over the litigant's need for information from the most convenient source."
"`312 S.C. at 61-62, 439 S.E.2d at 259-60. (Citations omitted.)
"`It seems clear to us, as it did to the Supreme Courts of Florida and South Carolina, that the purpose of a peer-review statute is to encourage full candor in peer-review proceedings and that this policy is advanced only if all documents considered by the committee or board during the peer-review or credentialing process are protected. In the title to Act No. 81-801, the Legislature stated the purpose of the Act as being "[t]o provide for the confidentiality of all written materials and activities concerning the accreditation, quality assurance, or similar function of any hospital, clinic, or medical staff." Given the broad language used by the Legislature in the title to this Act, we conclude that the documents the plaintiff seeks from the two hospitals are privileged. The information submitted to this Court under seal includes only Dr. Krothapalli's applications for staff privileges over the past several years. These documents clearly fall under the protection of § 22-21-8.
"`We note that § 22-21-8(b) provides:
"`"Information, documents, or records otherwise available from original sources are not to be construed as being unavailable for discovery or for use in any civil action merely because they were presented or used in preparation of accreditation, quality assurance or similar materials nor should any person involved in preparation, evaluation, or review of such materials be prevented from testifying as to matters within his knowledge, but the witness testifying should not be asked about any opinions or data given by him in preparation, evaluation, or review of accreditation, quality assurance or similar materials."
"`Accordingly, § 22-21-8 does not protect information if it is obtained from alternative sources. Hence, a plaintiff seeking discovery cannot obtain directly from a hospital review committee documents that are available from the original source, but may seek such documents from the original source. ...'
" 762 So.2d at 838-39...."
*202 768 So.2d at 377-78. (some emphasis added in Qureshi, other emphasis added here.) Section 22-21-8, as explained in Qureshi and Krothapalli, provides that under our peer-review statute, information and documents produced by hospitals, their agencies, or bodies, in furtherance of their official duties and activities in regard to the peer-review process, are not discoverable.
Section 34-24-58, Ala.Code 1975, reads:
"(a) The decisions, opinions, actions and proceedings rendered, entered or acted upon in good faith and without malice and on the basis of facts reasonably known or reasonably believed to exist of any committee of physicians or surgeons, acting as a committee of the Medical Association of the State of Alabama, or any state, county or municipal medical association or society, or as a committee of any licensed hospital or clinic, or the medical staff thereof, undertaken or performed within the scope and function of such committee as legally defined herein shall be privileged, and no member thereof shall be liable for such decision, opinion, action or proceeding.
"(b) Within the words and meaning of this section, a committee shall include one formed or appointed as a utilization review committee, or similar committee, or committee of similar purpose, to evaluate or review the diagnosis or treatment or the performance of medical services which are performed with respect to private patients or under public medical programs of either state or federal design, with respect to any physical or mental disease, injury or ailment or to define, maintain or apply the professional or medical standards of the association, society, hospital, clinic or medical staff from, by or for which it was appointed."
This provision mandates that information gathered or formulated within the scope of business conducted by such committees is privileged from external review. Section 34-24-59(c) builds upon the foundation laid by § 34-24-58, by requiring that "[a]ny report [of formal disciplinary action related to professional ethics, medical incompetence, moral turpitude, or drug or alcohol abuse, resulting in termination, reduction, or resignation of hospital privileges and reported to the proper authorities]... shall be privileged from discovery." See also § 34-24-59(a). Therefore, Cabaniss's attempt to obtain discovery of information or documents regarding Anderson's performance and privileges past or presentfrom any pertinent hospital or medical-review committee is barred.
In reaching this holding, we remain mindful of the intent of the Legislature when it enacted these statutes: to encourage meaningful peer review, with the goal of providing a better, more efficient, medical system for the people of this State. See Qureshi, supra, quoting Krothapalli, supra.

C.
The trial court ordered Dr. Anderson to provide discovery regarding any instances where he drilled too far into a bone and penetrated the skull or dura during a drilling procedure and any instances between 1995 and 1998 when he suffered a delay in transporting or arranging the transfer of a patient to another facility.
As previously stated, § 6-5-551 prohibits Dr. Anderson from responding to discovery requests regarding any instances other than the one specifically alleged in Cabaniss's complaintspecifically, the Trotter incidentdespite the trial court's attempt to narrowly frame the issue as compelling discovery regarding only incidents *203 of misperformed drill procedures and transfers of patients to other facilities, instead of any and every alleged incident of malpractice committed by Dr. Anderson.
Dr. Anderson argues that the statutory framework created by §§ 6-5-551, 6-5-333, 22-21-8, 34-24-58, and 34-24-59, Ala. Code 1975, serves to absolutely insulate him, his documents, and other information concerning the Trotter case, whether obtained from him personally, from the hospital, or from other committees. We do not completely agree. His contention regarding the material gathered from the hospital or review committees is correct; documents from those sources generated pursuant to hospital or committee business is absolutely not discoverable. See §§ 6-5-333, 22-21-8, 34-24-58, and 34-24-59, Ala.Code 1975. However, information and documents that specifically concern the Trotter incident and that may be obtained from Dr. Anderson himself as an "original source" are discoverable. See §§ 6-5-551 and 6-5-333, Ala.Code 1975.

III.
In conclusion, we hold that the trial court erred in granting Cabaniss's motion to compel discovery. Cabaniss may not compel discovery as to incidents of alleged malpractice by Dr. Anderson except for discovery of evidence specifically relating to the Trotter incident. Although Cabaniss is not entitled to information or documents regarding any incidents of alleged malpractice committed by Dr. Anderson except as to those specifically alleged in their complaint and are likewise not entitled to any information or documents regarding the Trotter case resulting from the quality assurance inquiry of the hospital or any associated committee, she is entitled to any information and documents regarding her specific allegations that can be obtained from Dr. Anderson himself as an original source. Likewise Cabaniss is entitled to any material produced by the hospital or any associated committee in its regular course of business. Thus, the trial court abused its discretion in granting Cabaniss's motion to compel discovery. Therefore, we grant the petition in part and issue the writ, directing the trial court to modify its order so as to grant Dr. Anderson's request to protect from discovery 1) any information concerning medical-malpractice incidents other than the Trotter incident and 2) any materials resulting from the peer-review process, and so as to deny his request insofar as it regards information that can be obtained from him, as an original source, or from the hospital or any medical committee in its regular course of business.
PETITION GRANTED IN PART AND DENIED IN PART; WRIT ISSUED.
MADDOX, HOUSTON, and ENGLAND, JJ., concur.
SEE, LYONS, and BROWN, JJ., concur in the result.
LYONS, Justice (concurring in the result).
The failure to move for a second protective order directed to the production required in the order entered in response to Dr. Anderson's previous motion to reconsider or, in the alternative, for a protective order does not require that the petition be denied for a failure to show the unavailability of another adequate remedy. Where the trial court has had the opportunity, in ruling on a previous motion for a protective order, to address the grounds asserted by the party opposed to production, it would exalt form over substance to require the filing of a second motion for a protective order reciting the same grounds merely because the trial court, in ruling on the *204 previous motion, created a new deadline. Compare Ex parte Horton Homes, Inc., 774 So.2d 536 (Ala.2000) (petition for writ of mandamus denied for failure to demonstrate inadequacy of other remedy where a potential avenue of relief had been waived). The circumstances here presented are quite different from those presented in Horton Homes, where the trial court had never been asked to rule on a motion for a protective order before the deadline for discovery.
NOTES
[1] Before this mandamus petition was filed, Cabaniss settled the claim against Four Rivers. Cabaniss filed a "Joint Stipulation for Dismissal" with the trial court. The claim against Four Rivers was dismissed with prejudice. The trial court stated in the dismissal order that Cabaniss's claims against Dr. Anderson and Selma Doctors Clinic, P.C., were not affected by the settlement reached with Four Rivers. However, the trial court did not have jurisdiction to entertain that "stipulation" because before it was filed, this Court had stayed all proceedings in this case pending its ruling on this mandamus petition concerning discovery issues.