978 So.2d 700 (2007)
Elaine LEISER
v.
RAYMOND R. FLETCHER, M.D., P.C., a corporation; Raymond R. Fletcher, M.D., an individual.
1051698.
Supreme Court of Alabama.
August 3, 2007.
Robert J. Hedge and Charles L. Miller, Jr., of Miller & Hedge, Mobile; and Daniel G. Blackburn of Blackburn & Conner, P.C., Bay Minette, for appellant.
*701 Michael K. Wright and Robert P. MacKenzie III of Starnes & Atchison, LLP, Birmingham; John Peter Crook McCall of Starnes & Atchison, LLP, Mobile; and Bayless E. Biles of Wilkins, Bankester, Biles & Wynne, P.A., Bay Minette, for appellees.
STUART, Justice.
Elaine Leiser sued Dr. Raymond R. Fletcher and his medical practice, Raymond R. Fletcher, M.D., P.C., in the Baldwin Circuit Court, alleging that Dr. Fletcher had committed medical malpractice when, while performing arthroscopic surgery on her right knee, he accidentally cut blood vessels in the back of her knee. Following an eight-day trial, the jury returned a verdict in favor of Dr. Fletcher and his medical practice. Leiser now appeals from the judgment entered on that verdict. We affirm.

I.
On August 25, 2000, Leiser injured her right knee on an airplane while she was returning home from a trip made on behalf of her employer, Quorum Health Resources, LLC ("QHR"). She first received treatment for the injury from her family doctor; however, when her knee did not improve and because her injury was considered to have occurred on-the-job, QHR eventually referred her to Dr. Fletcher. Dr. Fletcher treated the knee injury conservatively, and Leiser underwent regular physical therapy. However, when the knee still did not show improvement, Dr. Fletcher and Leiser decided that she should have an arthroscopic meniscectomy to remove approximately 90% of the lateral meniscus in the injured knee. On March 22, 2001, Dr. Fletcher performed the meniscectomy upon Leiser. Although Dr. Fletcher was successfully able to remove the selected portions of the lateral meniscus during the 32-minute procedure, it was determined after the surgery that he had also inadvertently cut the veins and the artery located behind the knee capsule. As a result, Leiser was required to undergo six additional surgeries and was left with permanent muscle and nerve damage to her leg.
On February 21, 2002, Leiser sued QHR, seeking worker's compensation benefits. On October 16, 2002, Leiser amended her complaint to add a medical-malpractice claim against Dr. Fletcher and his medical practice.[1] Leiser's medical-malpractice claim was severed from her worker's compensation action, and, following a lengthy period of discovery, that claim proceeded to trial on April 10, 2006. On April 21, 2006, the jury returned a verdict against Leiser and in favor of Dr. Fletcher and his medical practice. The trial court entered a judgment on the verdict, and, on May 19, 2006, Leiser filed a postjudgment motion seeking a judgment as a matter of law or, in the alternative, a new trial. Leiser argued in that motion that the trial court committed reversible error by allowing Dr. Fletcher to introduce evidence of prior acts, i.e., prior successful surgeries he had performed, that were not the subject of this action because such evidence violated § 6-5-551, Ala.Code 1975, and that the trial court had erred in denying her motion for a judgment as a matter of law because, she claimed, Dr. Fletcher had failed to rebut her prima facie showing that he had violated the applicable standard of care.[2] The trial court denied Leiser's *702 motion, and she now makes those same arguments on appeal.

II.
We first consider Leiser's argument that she is entitled to a new trial because the trial court allowed Dr. Fletcher to introduce evidence of prior acts even though, she claims, such evidence was irrelevant and was prohibited by § 6-5-551. Specifically, Leiser objects to testimony presented by Dr. Fletcher indicating: (1) that he had performed more than 1,500 arthroscopic meniscectomies in his career; (2) that in each of those previous surgeries he had met the standard of care; and (3) that he always uses the same technique when performing this surgery.
In Middleton v. Lightfoot, 885 So.2d 111, 113-14 (Ala.2003), this Court explained the standard of review applicable in this case:
"`"The standard applicable to a review of a trial court's rulings on the admission of evidence is determined by two fundamental principles. The first grants trial judges wide discretion to exclude or to admit evidence."' Mock v. Allen, 783 So.2d 828, 835 (Ala.2000) (quoting Wal-Mart Stores, Inc. v. Thompson, 726 So.2d 651, 655 (Ala. 1998)). Despite the latitude afforded the trial court in its evidentiary rulings, a trial court exceeds its discretion where it admits prejudicial evidence that has no probative value. See Powell v. State, 796 So.2d 404, 419 (Ala.Crim.App.1999), aff'd, 796 So.2d 434 (Ala.2001).
"`"The second principle `is that a judgment cannot be reversed on appeal for an error [in the improper admission of evidence] unless . . . it should appear that the error complained of has probably injuriously affected substantial rights of the parties.'"' Mock, 783 So.2d at 835 (quoting Wal-Mart Stores, 726 So.2d at 655, quoting in turn Atkins v. Lee, 603 So.2d 937, 941 (Ala.1992)). See also Ala. R.App. P. 45. `The burden of establishing that an erroneous ruling was prejudicial is on the appellant.' Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165, 167 (Ala.1991)."
We do not reach the issue whether the trial court exceeded its discretion by admitting the challenged testimony, because its judgment is due to be affirmed based on the second principle  Leiser cannot claim she was prejudiced by the trial court's ruling when, in fact, she introduced substantially identical evidence as part of her case-in-chief.[3]
*703 Leiser began her case at trial by showing the jury portions of Dr. Fletcher's videotaped depositions. The approximately 1 hour and 26 minutes of footage shown included the following excerpts:
"Q: What protocol do you follow  what is it that you follow that you say reduces the risk of you exiting the knee capsule?
"A: Again, the technique that I follow is I inspect the knee and then I go to the source, and then I use certain instruments that I feel are safe that I have used before. And, again, arthroscopic knee surgery is a technique that you develop a feel for. And when you use the instruments, you have a feel of what you are doing. And you have visualization of a certain portion of that procedure.
". . . .
"Q: Did you know where you were when you cut the popliteal artery and popliteal veins in Ms. Leiser's situation  when you cut it?
"A: Again, the standard technique that I used is to probe the meniscus with the scope and to put the instrument in and make the cut and probe it again with the scope. It's a constant interplay between the probe, instrument and scope.
". . . .
"Q: Okay, and you know that in doing this procedure, you want to make sure that you do not do anything  or use a technique whereby you would exit that knee capsule; correct?
"A: Well, you use a technique, as described, to trim the  as far as the posterior horn is concerned, in this case, to trim the remaining rim.
"Q: Okay.
"A: And that's the technique that is used, based on visualization with the probe and the scope and exchanging the probe for the instrument.
". . . .
"Q: Now, if you were using your technique, Doctor, that is, you knew where you were, and before you made that cut you know what  you knew what tissue you were cutting 
"A: Yes.
"Q: That's the proper technique, correct?
"A: That's the proper technique.
"Q: Okay. If you were using the proper technique, then how did you possibly exit the knee capsule, the back of the knee capsule, and lacerate the popliteal artery, completely sever it in two, completely sever a vein and partially sever another vein, if you were using that technique?
"A: I don't know.
"Q: Does it seem reasonable to you that the reason that you severed that was because you were not using the proper technique at that time, when you were resecting that portion of the posterior horn?
"A: No. I was using the proper technique, based upon my training and experience.
"Q: Well 
"A: Based on visualization with the probe and the cutting instrument and the probe, the alternating three-stage procedure to inspect, cut, and inspect.
"Q: You say that you were, but you don't remember what you did when you got back there, do you?

*704 "A: Well, I don't remember the specific details of the procedure. But the  a complex tear of the lateral meniscus, that's how it's done and that's the technique that I was trained in and that's how I do a meniscectomy.
"Q: And you don't make for the possibility that, for whatever reason, you didn't follow that technique in this particular case?
"A: No. I don't deviate from the technique, as far as doing a meniscectomy. It's a procedure that's done thousands of times. I've done over  well over two thousand of these. Maybe not lateral meniscectomies, but meniscectomies in general."
Thus, Leiser herself introduced evidence in which Dr. Fletcher described his technique for performing a meniscectomy, stated that that technique was proper, stated that he had used that technique during Leiser's surgery, and stated that he had used that same technique to perform over 2,000 meniscectomies, including lateral meniscectomies. Nevertheless, Leiser objects to the following testimony by Dr. Fletcher as part of his defense:
"Q: You've got a routine, I think you just told us in 20 years doing this kind of surgery, try to minimize injury to the popliteal artery?
"A: Yes, I have a standardized procedure in which I follow to do all arthroscopic surgery to limit injury.
"Q: Just tell us briefly what are some of those precautions that you've done over 20 years.
"A: The precautions I take is to use a standardized procedure in which I was trained. And the standardized procedure is to look at the knee, interior of the knee as I described here, and to establish a field of view so that you can have direct visualization of the area of pathology. And in that field of view, you apply the probe and the cutting instrument and you cut where you know your cutting instrument is.
". . . .
"Q: Do you have an opinion as to whether or not you had sufficient training and experience to perform that procedure?
"A: Yes. I'm well trained, have done several  over 1,000 arthroscopies, done them the same way every single time. I was well trained and this is the way I do it every single time.
". . . .
"Q: Based upon your recollection and your operative report, do you have an opinion as to whether or not the technique that you used for Ms. Leiser was consistent and followed the technique that you have been trained and exercised for 20-something years?
"A: The technique that I followed on Ms. Leiser to excise the lateral meniscus is the same technique that I've used for over a thousand arthroscopies, 1,500 meniscectomies, what I was trained at [Louisiana State University], same technique. Establish the field of view. Insert the instruments. Exactly the same technique. I haven't deviated from that technique.
"Q: Do you have an opinion as to whether or not the technique that you've been trained and use now is a reasonable technique?
"A: It's a reasonable and recognized technique.

*705 ". . . .
"Q: All right. Did you, from your operative report, your recollection, and your routine of 20 years, do you have an opinion as to whether or not the operative procedure that you performed on March 22, 2001, on Ms. Leiser was reasonable and met the standard of care as exercised by orthopedic surgeons in the national medical community under like or similar circumstances?
"A: Yes, sir. I met the standard of care. I used the same technique I've used all the time.
". . . .
"Q: Taking everything into consideration, did you approach Ms. Leiser's care from the beginning until the last time you saw her in a cautious and careful and reasonable manner?
"A: I approached Ms. Leiser's care with the best that I could provide. The best medical care that I could provide. I worked her up. I thought that she was a proper candidate. I used a standard technique. I took precautions that I always take. I used a standard technique. I did it the same way I've done it all the time. And I met the standard of care in performing this surgery. I feel terrible that this happened."
Leiser objects to other portions of Dr. Fletcher's testimony as well; however, this representative sample is sufficient to demonstrate that, in fact, there is little substantive difference between the objected-to live testimony given by Dr. Fletcher and the videotaped deposition testimony first introduced into evidence by Leiser herself during her case-in-chief. Accordingly, Dr. Fletcher's live testimony was merely cumulative and, even if it was irrelevant and violated § 6-5-551, Leiser was not prejudiced by its admission.[4] See Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App. 1995) ("The erroneous admission of evidence that is merely cumulative is harmless error." (citing Reese v. City of Dothan, 642 So.2d 511 (Ala.Crim.App.1993)); see also Ex parte D.L.H., 806 So.2d 1190, 1193 (Ala.2001) ("`"A party who has brought out evidence on a certain subject has no valid complaint as to the trial court's action in allowing his opponent or adversary to introduce evidence on the same subject."'" (quoting Hubbard v. State, 471 So.2d 497, 499 (Ala.Crim.App.1984), quoting in turn Brown v. State, 392 So.2d 1248, 1260 (Ala.Crim.App.1980))).

III.
We next consider Leiser's argument that Dr. Fletcher failed to present competent evidence rebutting her prima facie showing that he violated the applicable standard of care and that the trial court accordingly erred in failing to grant her motion for a judgment as a matter of law. In Waddell & Reed, Inc. v. United Investors Life Insurance Co., 875 So.2d 1143, 1152 (Ala.2003), this Court explained the standard of review applied to a ruling on a motion for a judgment as a matter of law:
"When reviewing a ruling on a motion for a [judgment as a matter of law], this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a [judgment as a matter of law]. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, *706 the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a [judgment as a matter of law]. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a [judgment as a matter of law], this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id."
During her case-in-chief, Leiser presented expert testimony indicating that "Dr. Fletcher breached the standard of care by cutting the [popliteal blood] vessels, which were outside the surgical field, when he could not see the tip of his cutting instrument, when he could not see the tissue he was cutting (the vessels), and by not properly identifying the correct tissue before he cut it." (Leiser's brief, pp. 50-51.) Therefore, under the applicable standard of review, our inquiry is whether Dr. Fletcher has presented sufficient evidence indicating that he did not breach the standard of care so as to allow the case to be submitted to the jury. We answer that question in the affirmative.
At trial, Dr. Fletcher called Dr. Todd Volkman to testify in his defense. Under cross-examination, Dr. Volkman testified as follows:
"Q: If an orthopedic surgeon can't see tissue at all at any point in time during his procedure and he starts cutting, would that be a breach of the standard of care?
"A: When you say cannot see the tissue at all, could you place that in context, please?
"Q: Yes. In performing  I thought we were talking about [Leiser's] procedure. You understand it was a lateral meniscectomy?
"A: Yes?
"Q: And Dr. Fletcher exited the posterior capsule and cut the popliteal vessels, correct?
"A: Yes.
"Q: All right. And I asked you, you testified for the jury earlier that there's no way with the scope to see behind the capsule, didn't you?
"A: Yes.
"Q: Okay. So he 
"A: But 
"Q:  never saw the popliteal vessels when he was cutting, correct?
"A: That is correct. However, if he is taking great time and effort to assess the tissue that he is about to cut and has responsibly done that and is comfortable doing it and experienced doing it and makes the cut, and that happens, that does not mean that he  that he is outside of the standard of care. It's possible to have damaged the popliteal  those three structures that are tight together behind the lateral meniscus and still be operating within the standard of care. Just because that happened, it does not mean since this happened, then this is malpractice. It's not  it's not that way.

*707 "Q: Doctor, he didn't inspect behind the capsule with the scope, did he? He couldn't see?
"A: If he inspected the meniscus and was comfortable. If he's experienced and he inspected the meniscus and was comfortable with the cut he was going to make and made the cut and inadvertently it went through the capsule and damaged these vessels, then that is not malpractice. He did not see that. But he did what is reasonable. If we got  if I got in trouble every time I cut something I didn't mean to, even though I took care, I'd be out of business.
"Q: Have you stated your position? Are you finished?
"A: I believe for that portion of your question, I have.
"Q: All right. Now, I'd like to get back to my question. And I'd like to get an answer to it.
"A: Yes, sir.
"Q: All right, Dr. Fletcher couldn't see the popliteal vessels with the scope. You've already told us that's impossible, correct? You stated that during an arthroscopy, you can't see behind the capsule with the scope, correct?
"A: Yeah, that's correct.
"Q: All right. So there's no way to inspect any tissues posterior to the capsule, correct, outside?
"A: That would not  that's not usually done.
"Q: All right. So if some  if Dr. Fletcher went behind the capsule and started cutting, number one, he couldn't see it, number two, he never could have inspected it, that would be a breach, wouldn't it?
"A: No.
"Q: Why not?
"A: If he took the time to palpate the meniscus, assess it, and was comfortable with the tissue that was going to be cut and made the cut, and if after having done that, that penetrated the capsule and damaged the vessels, then in my opinion that is not malpractice. It's an unfortunate event. And it's sad that it's happened. But the truth is that's not  that doesn't mean that he was back there irresponsibly. It's possible to have this injury and still be operating within the standard of care.
"Q: Doctor, have you ever severed the popliteal artery and vein during an arthroscopic meniscectomy?
"A: No. It is a rare event.
"Q: And you know what, Doctor, it's true isn't it, that when you cut, you personally make sure that your cutting tip is in view, don't you?
"A: No, I mean, I try my best. But like I've said several times before, it is physically impossible to always see the cutting tip at all times during the cut. It's not possible.
"Q: Are you saying that you personally do not cut what you can't see?
"A: I probe the tissue. I assess it. And I make myself comfortable with it. But while the cut is being made, it is not possible to make the cut with the shaver and see the cutting surface. You have to be careful when you're doing this, and I don't want anyone to think that this is a haphazard procedure because it's not. But in order to cut the meniscus with the shaver device, the shaver device has  it's impossible to see through the shaver to the cutting edge.

*708 "Q: Doctor, I don't understand. You're mentioning a shaver. Are you not aware that Dr. Fletcher testified that it's his best guess that he did it with the biting forceps?
"A: Same thing with the biting forceps, you put the biting forceps back there and you're looking at it from the handle side to the biting side. And the shaft of the instrument is obscuring the biting tips. You have an idea where it is and you poke and you put those biting forceps back to the same area where you were probing before, and when you put it back there and open it up and come down, it's frequently very difficult to see it at all times.
". . . .
"Q: All right. So this [holding forceps] is the instrument that we're talking about, right? And now getting back to my question, you personally make sure that you see what you cut, don't you?
"A: I personally inspect the tissue thoroughly and make myself comfortable with what is going to be cut before applying the basket forceps and making the cut.
"Q: Well, why don't we just look at your deposition?
"A: Okay.
"Q: That's correct testimony, isn't it?
"A: Yes.
"Q: Okay. Page 254, beginning on line 4. We'll go through the whole litany so that we're clear on this. They're going to flash it on the screen.
"A: I just want to kind of get the feel of the whole thing.
"Q: It's going to be most of the page because I want to be sure that you're accurate. Beginning at line 4, you were asked, `Can you or can you not see the entire posterior horn and lateral meniscus when you sweep the scope?' And your answer was, `Sometimes you can. Sometimes you can't.' Right?
"A: Yes.
"Q: Okay. And then the next question was, `When you can't see it at all, that means you can't do an inspection of it, correct?' And what is your answer, Doctor?
"A: `Well, if you have in general  if I have trouble seeing it from the  one portal, I'll switch to the other portal and, you know, do whatever you need to do to see it. And if you can't see it, you can't see it.'
"Q: And the next question was, `And if you can't see it even by switching the portals, then you don't do any cutting back there, correct?' And what was your answer?
"A: `Yes, I personally do not do any cutting that I can't inspect.'
"Q: And then follow down. Okay. And your answer is?
"A: `Or I can't see.'
"Q: Or can't see?
"A: `Or can't see.'
"Q: Right?
"A: Inspect or, yes, if I cannot see the area at all where I think the problem is, I will not cut back there.
"Q: You personally don't cut what you can't see. And that's being a good doctor?
"A: Well, what I haven't seen before, I personally do not cut. If I  you know, I think that's it. If I can't see it  if I haven't been able to see it with the scope or haven't been able to palpate it with the scope, then I will not cut.

*709 "Q: Doctor, if you stay inside the knee capsule with the cutting instruments during this procedure, you eliminate the possibility of cutting the popliteal vessels, correct?
"A: Yes, if you stay fully within the capsule.
"Q: And if you do this surgery correctly, you don't injure the popliteal vessels, correct?
"A: That is incorrect. The risk is always present, even 
"Q: Let's go to page 216 of your deposition, Doctor. Line 7. `Doctor, if you do this surgery properly, you don't cut the popliteal artery, do you?' And what is your answer at line 11?
"A: `Ideally not.'"
Thus, while Leiser presented evidence indicating that Dr. Fletcher breached the standard of care by "cutting the [popliteal blood] vessels, which were outside the surgical field, when he could not see the tip of his cutting instrument, when he could not see the tissue he was cutting (the vessels), and by not properly identifying the correct tissue before he cut it," Dr. Volkman testified that even though that may be true  that Dr. Fletcher accidentally left the surgical field and cut the popliteal blood vessels when he could not see either his cutting instrument or the arterial and venous tissue being cut  those actions do not automatically constitute a breach of the standard of care:
"If he's experienced and he inspected the meniscus and was comfortable with the cut he was going to make and made the cut and inadvertently it went through the capsule and damaged these vessels, then that is not malpractice. He did not see that. But he did what is reasonable."
Thus, although Leiser established a prima facie case indicating that Dr. Fletcher did breach the standard of care, Dr. Volkman's testimony, combined with Dr. Fletcher's testimony regarding the technique he used on Leiser, indicated that Dr. Fletcher did not breach the standard of care.[5] A factual question was therefore presented and that question was properly submitted to the jury. Accordingly, Leiser's motion for a judgment as a matter of law was correctly denied.

IV.
Leiser argues that the trial court committed reversible error by allowing Dr. Fletcher to introduce evidence of prior acts, i.e., previous successful surgeries he had performed, that were not the subject of this action, and that Dr. Fletcher failed to rebut her showing that he had violated the applicable standard of care. However, even if the trial court erred by allowing the objected-to evidence, Leiser was not prejudiced by that error because she had earlier submitted into evidence substantially similar evidence. Moreover, the testimony of Dr. Fletcher and Dr. Volkman was sufficient to rebut Leiser's showing that Dr. Fletcher had violated the standard of care while performing surgery on *710 Leiser, and the case was accordingly properly submitted to the jury. For these reasons, the judgment entered in favor of Dr. Fletcher and his medical practice is affirmed.
AFFIRMED.
SEE, LYONS, WOODALL, SMITH, BOLIN, and PARKER, JJ., concur.
MURDOCK, J., concurs in the result.
COBB, C.J., concurs in the rationale in part and concurs in the result.
COBB, Chief Justice (concurring in the rationale in part and concurring in the result).
I concur with the majority in the analysis in Part III of the opinion; however, I concur in only the result of the analysis in Part II. In Part II, the majority refuses to reach the issue whether the trial court exceeded its discretion in denying Leiser's motion in limine concerning evidence of Dr. Fletcher's prior acts and thus allowing that evidence to be introduced at trial. I write specially to explain why I believe, had it been properly preserved, an objection to the denial of the motion in limine would have shown reversible error.
Section 6-5-551, Ala.Code 1975, part of the Alabama Medical Liability Act of 1987, provides:
"In any action for injury, damages, or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, whether resulting from acts or omissions in providing health care, or the hiring, training, supervision, retention, or termination of care givers, the Alabama Medical Liability Act shall govern the parameters of discovery and all aspects of the action. The plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff and shall include when feasible and ascertainable the date, time, and place of the act or acts. The plaintiff shall amend his complaint timely upon ascertainment of new or different acts or omissions upon which his claim is based; provided, however, that any such amendment must be made at least 90 days before trial. Any complaint which fails to include such detailed specification and factual description of each act and omission shall be subject to dismissal for failure to state a claim upon which relief may be granted. Any party shall be prohibited from conducting discovery with regard to any other act or omission or from introducing at trial evidence of any other act or omission."
(Emphasis added.) When initially enacted by the legislature, § 6-5-551 provided that only the "[p]laintiff shall be prohibited from conducting discovery with regard to any other act or omission or from introducing at trial evidence of any other act or omission." As initially written, § 6-5-551 prohibited the plaintiff in a medical-malpractice case from introducing evidence of prior bad acts and omissions by the defendant, but the defendant health-care provider was permitted to introduce evidence of his prior good acts so long as doing so did not violate the Alabama Rules of Evidence. This was obviously one-sided, and as Justice Johnstone noted in commenting on that version of § 6-5-551, "what is sauce for the goose should be sauce for the gander." Ex parte Pfizer, Inc., 746 So.2d 960, 966 (Ala.1999) (Johnstone, J., dissenting). The Alabama Legislature, realizing the inequity presented by this statute, amended it in 2000 to provide that "any party" is prohibited from introducing evidence of any other act or omission at trial.
*711 Regarding § 6-5-551 as amended in 2000, this Court has previously noted: "We have reviewed the language of the statute, and we conclude that its meaning could not be clearer." Ex parte Anderson, 789 So.2d 190, 195 (Ala.2000). As Justice Houston noted:
"Section 6-5-551 states that in a medical-malpractice action, `[a]ny party shall be prohibited from conducting discovery with regard to any other act or omission or from introducing at trial evidence of any other act or omission.' We repeatedly interpreted this provision according the plain-meaning rule, ruling inadmissible evidence of `other act[s] or omission[s]' outside those specifically pleaded. Ex parte Coosa Valley Health Care, Inc., 789 So.2d 208, 218 (Ala.2000); Ex parte Anderson, 789 So.2d 190, 195 (Ala.2000); Ex parte Ridgeview Health Care Ctr., Inc., 786 2d 1112, 1116-17 (Ala.2000)."
Middleton v. Lightfoot, 885 So.2d 111, 116-17 (Ala.2003) (Houston, J., concurring specially). Dr. Fletcher's testimony regarding the number of successful arthroscopies he had performed without complication obviously is evidence of "other act[s]" that is encompassed in the prohibition found in § 6-5-551. Thus, the trial court erred in not granting Leiser's motion in limine regarding evidence concerning prior surgeries performed by Dr. Fletcher.
Dr. Fletcher argues that his testimony was permissible because, he says, he testified not only as a defendant, but also as his own expert in regard to the standard of care. Therefore, he contends, under § 6-5-548, Ala.Code 1975, his testimony regarding prior successful surgeries was necessary in order for him to be qualified as an expert. However, a review of the record indicates that Dr. Fletcher never asked the trial court to consider him an expert on the issue of the standard of care, nor did the trial court ever declare him an expert on the standard of care. Thus, Dr. Fletcher could not have been considered an expert in this case.
Even had Dr. Fletcher been deemed an expert by the trial court, I do not believe that § 6-5-548 can be used to circumvent the mandate of § 6-5-551 that other acts and omissions of any party are precluded as evidence at trial. Section 6-5-548(e) states, in pertinent part: "A health care provider may testify as an expert witness in any action for injury or damages against another health care provider based on a breach of the standard of care only if he or she is a `similarly situated health care provider' as defined above." (Emphasis added.) Section 6-5-548 contemplates a health-care provider testifying against or for another health-care provider; it does not contemplate a health-care provider testifying as his or her own expert witness. Thus, I believe it would have been improper for Dr. Fletcher to provide testimony as to the number of other surgeries he had performed and the outcome of those surgeries in order to "qualify" himself as an expert.
It should be noted, however, that had this Court addressed the issue whether the trial court erred by denying Leiser's motion in limine, it most likely would have reached the same result. I was unable to find in the record where Leiser asked for, or received, a standing objection to Dr. Fletcher's testimony concerning his prior surgeries. Although Leiser did object intermittently to Dr. Fletcher's testimony regarding his prior surgeries, Leiser's attorney failed to object to much of the testimony in question. "`"[U]nless the trial court's ruling on the motion in limine is absolute or unconditional, the ruling does not preserve the issue for [appellate review]." . . . If the ruling is not absolute, proper objections at trial are necessary to preserve the issue.'" Ex parte Martin, *712 931 So.2d 759, 763 n. 1 (Ala.2004) (quoting Central Alabama Elec. Coop. v. Tapley, 546 So.2d 371, 382 (Ala.1989), quoting in turn Perry v. Brakefield, 534 So.2d 602, 606 (Ala.1988)). It is apparent that Leiser knew that she was required to object during Dr. Fletcher's testimony in order to preserve the issue of the denial of the motion in limine, as evidenced by the following statement by her attorney to the trial court during a sidebar conference:
"I don't know if I should make an offer of proof. I know I can't refer back to my motion in limine because it's already been denied. The motion in limine, you denying it doesn't preclude this right here. That's the purpose of it. The law is we have to reassert that during our case-in-chief or else it's waived. I don't mean to be caught waiving anything."
However, there was no standing objection, and the intermittent objections made during Dr. Fletcher's testimony were insufficient to preserve this issue for this Court's review.
Because I believe that the trial court's denial of Leiser's motion in limine constituted error but that that error was not properly preserved for appellate review, I concur only as to the result of Part II of the opinion.
NOTES
[1] Leiser's husband, Ted Leiser, also added a loss-of-consortium claim in the amended complaint; however, that claim was eventually dismissed.
[2] Section 6-5-551 provides, in relevant part:

"In any action for injury, damages, or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, . . . the Alabama Medical Liability Act shall govern the parameters of discovery and all aspects of the action. The plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff and shall include when feasible and ascertainable the date, time, and place of the act or acts. . . . Any party shall be prohibited from conducting discovery with regard to any other act or omission or from introducing at trial evidence of any other act or omission."
[3] Chief Justice Cobb, in her opinion concurring in the rationale in part and concurring in the result, states that "the majority refuses to reach the issue whether the trial court exceeded its discretion in denying Leiser's motion in limine." 978 So.2d at 710. However, the decision not to address that issue is less a refusal and more a recognition of the principle that this Court should avoid the inclusion of dicta in its opinions. As the United States District Court for the Middle District of Alabama stated when declining to address an issue not necessary to the resolution of the case before it: "[I]t is unnecessary for the court to answer that question to resolve the present case/controversy before this court. The court exercises reasonable judicial restraint and declines to reach a conclusion that is only dicta." Professional Helicopter Pilots Ass'n v. Lear Siegler Servs., Inc., 326 F.Supp.2d 1305, 1318 n. 13 (M.D.Ala.2004).
[4] Dr. Fletcher disputes that the challenged testimony violated § 6-5-551 or that it was irrelevant. However, because of our resolution of this issue, we need not consider, and we express no opinion regarding, Dr. Fletcher's argument to that effect.
[5] Leiser argues that Dr. Fletcher's testimony regarding the technique he used during her surgery was mere speculation because he could not remember all of the details of the procedure. However, although Dr. Fletcher admitted not knowing when the blood vessels were cut, he could recall portions of the procedure, and he was certain as to the technique he used on Leiser. Moreover, both he and Dr. Volkman testified as to the propriety of that technique. Their combined testimony was sufficient to merit sending the case to the jury. Of course, the jury was free to consider Dr. Fletcher's imperfect recollection of the surgery when deciding what weight to give his testimony. Tidwell v. Upjohn, Co., 626 So.2d 1297, 1300 (Ala. 1993).