Dr. Rita W. Patton and her employer, the Frank Kay Psychiatric Clinic, the defendants below, were granted permission to appeal from the trial court's order denying Dr. Patton and the Clinic's "Rule 50(b)[, Ala. R. Civ. P.,] Renewed Motion for Judgment as a Matter of Law, or, Alternatively Styled, Motion for a Summary Judgment." See Rule 5, Ala. R.App. P. The trial court certified the following controlling question of law:
 "The controlling question of law is the degree of proof necessary to establish the essential element of proximate causation in a medical malpractice/wrongful death action against a psychiatrist for the suicide of that psychiatrist's patient and whether the plaintiff in this case has met that requisite degree of proof."
 Factual Background and Procedural History
Peggy Sue Ellis suffered from and had been treated for a serious psychiatric illness for approximately 30 years when she was admitted to Baptist Medical Center Montclair (hereinafter "BMCM") on November 11, 1999. She had previously been hospitalized for management of her psychiatric illness, and she had a history of suicide attempts. Before her November 11, 1999, admission, Ellis had been admitted three times to BMCM in 1999 for management of her psychiatric illness. Dr. Patton was Ellis's physician during all of her admissions in 1999.
Ellis was admitted to BMCM on November 11, 1999, following a suicide attempt. Dr. Patton prescribed Seroquel, a psychotropic agent used to treat schizophrenia. Ellis was placed on a suicide watch in the hospital; the watch continued during her hospital stay. Her condition waxed and waned during her stay. Her condition regressed from November 18 to November 19, and the dosage of her medication was increased. On November 22, 1999, when Ellis was asked whether she would hurt herself, she replied "I hope not." That same day, Ellis stated that she was scared and worried, and she showed signs of paranoia and unreasonable fears regarding her family. She also stated that she was anxious about being discharged the next day.
Ellis was discharged on November 23, 1999, with a discharge plan formulated by Dr. Patton. The plan included: (1) a follow-up appointment with Ellis's therapist at the Eastside Mental Health Center for the next morning; (2) arrangements for daily visits by a home-health psychiatric *Page 305 
nurse to monitor Ellis's mental state and to monitor compliance with the prescribed medication; and (3) help from Ellis's cousin in monitoring compliance with the prescribed medication.
On November 24, 1999, Ellis went to the Eastside Mental Health Center, where she was evaluated by her therapist. The therapist noted that Ellis had been unable to fill her prescription for Seroquel and that she was confused about her medications, obsessed with psychotic thoughts, and frightened and that she had an "inappropriate and blunted affect." Dr. Patton was unaware that Ellis had not been able to fill her prescription. On November 26, 1999, Ellis was found dead in her apartment of a drug overdose. The coroner determined that the manner of death was suicide. At the time of her death, Ellis was 53 years old.
On November 19, 2001, Marty Thompson, as administrator of Ellis's estate, sued Dr. Patton and the Clinic, alleging wrongful death under the Alabama Medical Liability Act, § 6-5-480 et seq. and § 6-5-541 et seq., Ala. Code 1975 ("the AMLA"). Thompson alleged that Dr. Patton had breached the standard of care by discharging Ellis from the hospital prematurely, failing to formulate an appropriate outpatient-treatment plan, failing to readmit Ellis to a psychiatric unit, and failing to implement proper suicide precautions.
At trial on March 19, 2004, Dr. Nathan Strahl, a psychiatrist, testified as an expert witness for Thompson. Dr. Strahl had reviewed Ellis's medical records, and his testimony regarding causation was as follows:
 "Q. . . . In your opinion, given your review of the records and your understanding of Ms. Ellis's condition on 11/23/99, was there a probability that she would attempt suicide or self harm if she was released from the hospital?
 ". . . .
 "A. That was a probability. The probability increases the more factors that she would carry leaving the hospital that are risk factors for suicide.
 "Q. And did Ms. Ellis possess many of these risk factors?
 "A. She did.
 "Q. Was it highly probable?
 "A. It was highly probable that she might do something to herself, yes.
 "Q. Doctor, in your opinion, should a treating psychiatrist, given what we know and what you have reviewed about Ms. Ellis, exercising reasonable care, diligence and skill have recognized this probability that you just testified to?
 "A. I would think so, yes, sir.
 ". . . .
 "Q. I think you just answered my next question, but I want to ask it so the record is clear. Strictly concerning this discharge which you have criticized today, given the facts and circumstances that you're aware of in Ms. Ellis's condition on 11/22/99, what would be the standard of care or what would the standard of care have dictated on the date concerning discharge?
 "A. In my medical opinion, with the night before, the statements about `I hope so,' reservations about not being suicidal, the continued psychotic features, I would be very concerned about discharge. Usually, the record shows some anxiety typically prior to discharge. I would not count that as a negative factor. Most patients would have some anxiety about leaving. But here we're having clear indication of psychotic symptoms and concerns that she voiced last night about being able to take care of herself in terms of safety. I think based on those two things, hospitalization [sic] is a bit premature. *Page 306 
 "Q. Doctor, did Ms. Ellis's discharge fall below the recognized standard of care for a psychiatrist?
 "A. In my medical opinion, it did." Dr. Strahl also testified as follows:
 "Q. And, Doctor, I want to clarify that, so let me ask you these questions. Did the standard of care dictate that Dr. Patton keep Ms. Ellis in the hospital beyond November 23, 1999?
 "A. My medical opinion, it did.
 ". . . .
 "Q. Doctor, do you have an opinion as to whether suicide was an eminent potential given Ms. Ellis's release on November 23, 1999?
 "A. Yes.
 "Q. And what is that opinion?
 "A. That it was."
Dr. Patton and the Clinic moved for a judgment as a matter of law at the close of Thompson's case, which the trial court denied. Dr. Patton and Dr. Joseph Lucas, a psychiatrist, testified for the defense. Dr. Patton and the Clinic again moved for a judgment as a matter of law at the conclusion of all the evidence. The trial court denied the motion. The jury was unable to reach a verdict, and the trial court declared a mistrial. Dr. Patton and the Clinic filed a motion entitled "Defendants' Rule 50(b)[, Ala. R. Civ. P.,] Renewed Motion for a Judgment as a Matter of Law, or, Alternatively Styled, Motion for a Summary Judgment." In that motion, they argued that Thompson failed to meet his burden of producing sufficient evidence to prove that Dr. Patton's alleged negligence was the proximate cause of Ellis's death. The trial court denied the motion in the following order:
 "Having given careful consideration to [Dr. Patton and the Clinic's] renewed motion for judgment as a matter of law, the court is of the opinion that [the] motion is due to be denied. Using the standard set out in Keeton v. Fayette County, 558 So.2d 884 (Ala. 1989), the court finds that [Thompson] has proffered sufficient evidence that a genuine issue of material fact exists, so as to allow this case to proceed to trial.
 "In Keebler v. Winfield Carraway Hospital, 531 So.2d 841 (Ala. 1988), the Supreme Court held that recovery for failure to prevent a suicide is dependent upon whether the defendant reasonably should have anticipated that the deceased would attempt to harm [herself]. Alabama law bases proximate causation in suicide cases on the foreseeability of the decedent's suicide. The Supreme Court has held foreseeability is legally sufficient if the deceased had a history of suicidal proclivities or manifested suicidal proclivities in the presence of the defendant or was admitted to the facility of the defendant because of a suicide attempt. Keeton, 558 So.2d at 887. The record is clear — Ms. Ellis had a history of recent suicide attempts and a suicide attempt was the primary indication for her admission to [BMCM] preceding her final discharge and subsequent suicide. Further, the record indicates Ms. Ellis continued to experience some suicidal proclivities during her final hospitalization at [BMCM]. The record also indicates Dr. Patton was aware of the manifestations of suicidal proclivities during [Ellis's] final hospitalization.
 "Having reviewed the record as a whole, it is this court's opinion [that Thompson] met the required threshold of proof that a reasonable jury could reach the conclusion that Ms. Ellis's suicide was proximately caused by [Patton and the Clinic's] negligence."
This Court granted a permissive appeal under Rule 5, Ala. R.App. P., to answer *Page 307 
the previously quoted controlling question of law.
The first part of the controlling question of law asks what degree of proof is necessary to establish the essential element of proximate cause in a medical-malpractice/wrongful-death action against a psychiatrist resulting from the suicide of the psychiatrist's patient. Dr. Patton and the Clinic contend that there is "an ostensible conflict between the case law discussing the concepts of foreseeability and proximate cause in suicide cases [i.e., Keebler v. Winfield Carraway Hosp.,531 So.2d 841 (Ala. 1988), and Keeton v. Fayette County,558 So.2d 884 (Ala. 1989),] and the case law discussing the `probably caused [the death in question]' standard of proof required in medical malpractice cases [§ 6-5-549, Ala. Code 1975]." (Petition to appeal p. 7.) According to Dr. Patton and the Clinic, applying Keebler and Keeton
dispenses with the requirement in § 6-5-549 that a plaintiff in a medical-malpractice action produce substantial evidence showing that the alleged breach of the standard of care "probably caused" the death in question. Put another way, they argued that if Keebler and Keeton apply because the death was by suicide, then a plaintiff would not need to present expert testimony as to the issue of causation because proximate cause would be established if the decedent had a history of suicidal proclivities or manifested suicidal proclivities in the presence of the defendant or was admitted to the defendant's facility because of a suicide attempt.
Thompson argues that Alabama courts have firmly distinguished the evidentiary requirements of a typical medical-malpractice case from a medical-malpractice case resulting from a patient's suicide. Thompson argues that he established proximate causation by satisfying all three of the criteria set out inKeebler and Keeton. He further argues that § 6-5-549 of the AMLA, as amended, did not affect prior precedent with regard to proximate cause and that whether Dr. Patton's alleged negligence was the proximate cause of Ellis's death is a question of whether Ellis's suicide was foreseeable.
 Discussion
This Court first addressed a caregiver's duty to guard against a patient's suicide in Keebler v. Winfield CarrawayHospital, 531 So.2d 841 (Ala. 1988). In Keebler a rescue squad was summoned to assist a man lying in a bed complaining of chest pains. They took the man to the emergency room, and the emergency-room physician diagnosed him as suffering from probable alcohol abuse, possible drug abuse, and chest pains. The man's son said the man had been drinking and that he could have ingested the sedative Valium, so the emergency-room physician pumped the man's stomach to prevent an overdose. The emergency-room physician also administered nitroglycerin to alleviate the chest pains and attempted to admit the man to the hospital. When the man continued to act disorderly and refused to enter his hospital room, the emergency-room physician contacted the police. The police told the man he would have to go to his room and, if he did not, that he would be taken to jail. The man refused to obey, and he was taken into custody. A couple of hours later, the man was found dead in a jail cell; he had hung himself by tying one end of a T-shirt around his neck and the other to a bar of the jail door.
The man's wife sued the emergency-room physician, among others, alleging wrongful death. The trial court granted the emergency-room physician's motion for a directed verdict at the close of the wife's case. On appeal, the wife argued that the emergency-room physician had abandoned his duty of care toward the man. This *Page 308 
Court stated that her argument presupposed that the physician owed the man a duty to continue medical treatment after he left the emergency room and that the existence of such a duty depended on whether the physician knew that the man was likely to commit suicide. This Court stated:
 "Making a physician's duty to guard against a suicide conditional on its foreseeability is a prudent rule and one consistent with our own decisions. In Mobile Infirmary v. Eberlein, 270 Ala. 360, 369, 119 So.2d 8, 17 (1960), we stated that ordinarily no one is required to guard against or take measures to avert that which a reasonably prudent person under the circumstances would not anticipate as likely to happen. In Jackson [v. Burton, 226 Ala. 483, 147 So. 414 (1933),] a medical malpractice case in which we addressed the issue of whether a physician abandoned his duty to render medical treatment at a critical stage of a patient's illness, we stated: `[W]hen a physician has undertaken the treatment of a patient whose condition, known to the physician, is such that without continuous or frequent expert attention, he is likely to suffer injurious consequences, he must either render such attention himself or see that some other competent person does so.' 226 Ala. at 485, 147 So. at 416.
 "In the case sub judice, [the wife] failed to introduce any evidence indicating that [the physician] should have reasonably foreseen her husband's suicide. Although [the wife's expert] testified that the combined effects of alcohol and Valium pose a calculable risk that a patient may attempt suicide, this evidence does not create an inference that [the husband]'s suicide should have been reasonably foreseen by [the physician]. [The wife] had the burden to show through expert testimony that [the physician] breached his duty to exercise such reasonable care, diligence, and skill as reasonably competent physicians in the national medical community ordinarily would in the same or similar circumstances. Code 1975, 6-5-484(a). Drs. Lane, Bryant, Eubanks Dulaney v. Otts, 412 So.2d 254 (Ala. 1982); Dobbs v. Smith, 514 So.2d 871 (Ala. 1987). [The wife] predicates her malpractice claim on the theory that [the physician] should have foreseen her husband's imminent self-destruction and then should have taken precautionary measures to prevent it from happening. However, [the expert]'s testimony did not satisfy the `unique quality of proof of the alleged wrongdoing' required in medical malpractice cases. Hines v. Armbrester, 477 So.2d 302 (Ala. 1985). [The expert] did not testify as to the national medical standard of care. Specifically, [the expert] did not testify that reasonably competent physicians within the national medical community when treating a patient who had ingested Valium and alcohol would view suicide as a reasonably foreseeable contingency to be guarded against, and that [the physician] breached the standard of care ordinarily exercised by other physicians in the national medical community by failing to foresee and to guard against [the husband]'s suicide. Moreover, the record did not indicate that [the husband] had a history of suicidal proclivities, that he manifested suicidal proclivities while at the hospital, or that he was admitted due to a suicide attempt. Arguably, such facts as these, if known to [the physician], would have rendered the contingency of suicide reasonably foreseeable. See Knuth, Civil Liability for Causing or Failing to Prevent Suicide, 12 Loy. L.A.L.Rev. 967, 991 (1979). Thus, [the wife] failed to meet her burden. The evidence presented *Page 309 
at trial did not create a fact question as to whether [the physician] should have foreseen [the husband]'s suicide. Therefore, the trial court correctly ruled, as a matter of law, that [the physician] was under no duty to render continuous attention to prevent the likely occurrence of [the husband]'s suicide. Jackson, supra."
Keebler, 531 So.2d at 845. Therefore, Keebler
does not concern itself with the element of proximate causation as set out in the controlling question. Rather, the duty the emergency-room physician owed to the deceased did not include a standard of care to protect against or to prevent suicide, because there was an absence of factors that would have made the patient's suicide foreseeable, thereby triggering such a duty.
In Keeton v. Fayette County, 558 So.2d 884
(Ala. 1990), the father of a teenager who died as a result of a self-inflicted hanging while confined in the county jail sued the County. The trial court entered a summary judgment in favor of the County. This Court held that the County had voluntarily undertaken the duty to provide cells for the detention of youthful offenders in the jail, which was generally used for the confinement of adults. In Keeton, this Court held that it was reasonably foreseeable as a matter of law that minors might attempt to harm themselves while incarcerated in a county jail, based upon § 12-15-61, Ala. Code 1975, addressing facilities to be used for the detention or shelter care of children, and the county jail manual adopted by the County in order to obtain approval by the Department of Youth Services to use county jail cells typically used for adult prisoners for the detention of juveniles.
 "There was evidence before the trial court when it granted Fayette County's motion for summary judgment that one reason for requiring the monitoring of a juvenile offender confined to a jail cell is to make certain that the juvenile does not injure himself. Therefore, the fact that juveniles may attempt to harm themselves when incarcerated was reasonably foreseeable as a matter of law. This is different from Keebler v. Winfield Carraway Hospital, 531 So.2d 841 (Ala. 1988), where it was held that foreseeability of a decedent's suicide is legally sufficient only if the deceased had a history of suicidal proclivities, or manifested suicidal proclivities in the presence of the defendant, or was admitted to the facility of the defendant because of a suicide attempt."
Keeton, 558 So.2d at 887. This Court reversed the summary judgment entered in favor of the County. Keeton
is similar to Keebler in that both concern a duty to the deceased. Keeton is distinguishable fromKeebler in that a duty to protect incarcerated juveniles was imposed upon the County because it was foreseeable that juveniles in that situation might attempt to harm themselves. Both Keebler and Keeton deal with the duty owed, based upon the presence or absence of the foreseeability of suicide, rather than the proximate causation issue presented by the trial court in the controlling question here.
In City of Crossville v. Haynes, 925 So.2d 944
(Ala. 2005), this Court applied the holding in Keebler
in a wrongful-death action involving the suicide of an inmate. In Haynes, the inmate's estate filed a wrongful-death and negligence action against the City, the police chief, the police officers, and the dispatchers after an inmate committed suicide in the city jail. The trial court entered a summary judgment in favor of the police chief and the police officers on the grounds of police-officer immunity under § 6-5-338(a), Ala. Code 1975, and/or under State-agent immunity *Page 310 
pursuant to Ex parte Cranman, 792 So.2d 392
(Ala. 2000). The estate's claims against the City and the dispatchers went to trial, and a jury found in favor of the dispatchers concluding that they had not acted negligently or wantonly. However, the jury returned a verdict against the City on the estate's claim of negligent training and awarded damages in the amount of $550,000, which was remitted to $100,000 pursuant to § 11-93-2, Ala. Code 1975.
On appeal, the City in Haynes argued that the trial court erred in allowing the negligent-training claim to go forward against the City, when the estate failed to show that the inmate had manifested suicidal proclivities in the presence of the individual defendants and, thus, had failed to show that the inmate's suicide was foreseeable. The inmate was arrested on a worthless-check warrant and never made any actual or implied threat to harm himself. The individual defendants knew only that the inmate had become irate on one occasion when he wanted to go outside to smoke and later apologized for his behavior, that he had mentioned to one of the officers that he had had a nervous breakdown and that a tornado had destroyed his business, that he had soiled his pants when he first came to the city jail, that he had requested some unidentified medication, and that he had asked to speak with a drug enforcement agent.
This Court in Haynes concluded that the evidence did not rise to the level necessary to establish that the individual defendants could have or should have reasonably foreseen that the inmate would commit suicide. "This test of foreseeability remains the law applicable today in determining whether aduty to prevent a suicide exists." 925 So.2d at 951
(emphasis added).
We note that several of the cases in which this Court has addressed civil liability arising out of a suicide involved custodial cases. See City of Crossville v. Haynes,925 So.2d 944; Tittle v. Giattina Fisher Co.,Architects, 597 So.2d 679 (Ala. 1992); Popham v. Cityof Talladega, 582 So.2d 541 (Ala. 1991); Keeton,558 So.2d 884. Prison officials have a duty to exercise ordinary and reasonable care for the protection of persons in their custody. This duty generally does not include protection from self-inflicted injury or death. However, the duty can include protection from self-inflicted injury or death when the prison officials knew or should have known that the prisoner might harm himself. The custodial cases have generally followed the foreseeability test set out in Keebler; once a custodian is aware that an inmate has suicidal proclivities, the custodian is on notice that suicide is a possible result and must act accordingly. A foreseeable suicide gives rise to a duty on the custodian's part. Haynes. The fact that the suicide was foreseeable, however, does not necessarily mean that the custodian's acts or omissions amounted to negligence. The defendant must exercise reasonable care for the protection of the inmate's life and health under the circumstances of the particular case. In other words, if the suicide is foreseeable, the custodian owes a duty to try to prevent the suicide. Conversely, in the absence of Keebler andKeeton factors in a medical-malpractice action involving a patient who commits suicide, the resulting lack of foreseeability would absolve a health-care provider of any duty to attempt to prevent the suicide.
The analysis in Keebler and Keeton focuses on "duty" in a case alleging negligence. In Keebler,supra, this Court found that there was no duty to prevent the suicide because the suicide there was not foreseeable. InKeeton, supra, once the County voluntarily agreed to provide jail cells for juvenile offenders, it assumed *Page 311 
a duty of acting with due care to make certain the juvenile offender did not harm himself. When a patient has a history of suicidal proclivities, has manifested suicidal proclivities in the presence of the defendant, or was admitted to the facility because of a suicide attempt, then the health-care provider has a duty to take reasonable precautions to prevent a suicide. In the present case, the record supports the trial court's findings in its order that Dr. Patton knew that Ellis had suicidal proclivities and that she was aware that Ellis had manifested suicidal proclivities during her last hospitalization. Accordingly, Dr. Patton had a duty to take reasonable precautions to prevent Ellis's suicide. Keebler.
Thompson argues that he established proximate cause by presenting evidence of Ellis's suicidal proclivities, in conformance with Keebler. However, the Court inKeebler addresses foreseeability in the context of duty, not proximate cause. This is evidenced by theKeebler Court's reframing of the plaintiffs argument from abandonment of duty to whether the doctor and hospital owed Keebler a duty and its holding that the existence of such a duty depends on whether the doctor knew or should have known that Keebler was likely to commit suicide. The Keebler Court addresses duty but not causation. Furthermore, theKeebler Court pretermitted any discussion of whether the trial court erred in excluding testimony on the question of proximate cause.
Although Thompson has, in his medical-malpractice action, established that Dr. Patton owed a duty to Ellis based onKeebler, he must prove, generally through expert testimony, that there was an applicable standard of care, that Dr. Patton breached that standard, and that the breach was a proximate cause of Ellis's injuries. Lyons v. Walker Reg'lMed. Ctr., 791 So.2d 937 (Ala. 2000).[1] With regard to proximate cause, this Court has stated:
 "A plaintiff in a medical-malpractice action must also present expert testimony establishing a causal connection between the defendant's act or omission constituting the alleged breach and the injury suffered by the plaintiff. Pruitt v. Zeiger, 590 So.2d 236, 238 (Ala. 1991). See also Bradley v. Miller, 878 So.2d 262, 266 (Ala. 2003); University of Alabama Health Servs. Found., P.C. v. Bush, 638 So.2d 794, 802 (Ala. 1994); and Bradford v. McGee, 534 So.2d 1076, 1079
(Ala. 1988). To prove causation in a medical-malpractice action, the plaintiff must demonstrate `"that the alleged negligence probably caused, rather than only possibly caused, the plaintiffs injury."' Bradley, 878 So.2d at 266 (quoting University of Alabama Health Servs., 638 So.2d at 802). See also DCH Healthcare Auth. v. Duckworth, 883 So.2d 1214, 1217 (Ala. 2003)(`"There *Page 312 
must be more than the mere possibility that the negligence complained of probably caused the injury."' (quoting Parker v. Collins, 605 So.2d 824, 826 (Ala. 1992))); and Pendarvis v. Pennington, 521 So.2d 969, 970 (Ala. 1988). "The rule in medical malpractice cases is that to find liability, there must be more than a mere possibility among others that the negligence complained of caused the injury; there must be evidence that the negligence probably caused the injury."' (quoting Williams v. Bhoopathi, 474 So.2d 690, 691
(Ala. 1985), and citing Baker v. Chastain, 389 So.2d 932 (Ala. 1980)))."
Sorrell v. King, 946 So.2d, 854, 862 (Ala. 2006).
We do agree with Thompson that a medical-malpractice action based on a patient's suicide is different from a general medical-malpractice action because in the former the patient's death is at his own hands. The Illinois Court of Appeals, in discussing the propriety of jury instructions in an action against a health-care provider arising out of the provider's treatment of a patient with suicidal ideas, stated:
 "[T]his case is different than the typical medical malpractice case because plaintiff here alleges medical malpractice by a psychiatrist treating a suicidal patient who ultimately committed suicide. The critical distinction between this case and all other medical malpractice cases is that here the patient does not share the goal of his physician of getting better; while the doctor is working to assist the patient to suppress suicidal tendencies, the patient, by the nature of his illness, may be working at cross-purposes to his doctor's suggestion and may not be interested in following instructions designed to enable him or her to safely take prescribed medication."
Peoples Bank of Bloomington v. Damera,220 Ill.App.3d 1031, 1035, 581 N.E.2d 426, 429, 163 Ill.Dec. 475, 478 (1991).
The trial court in its order denying the defendants' motion for a judgment as a matter of law blurred the distinction between the different elements necessary to establish medical malpractice when it stated, based on Keebler andKeeton: "Alabama law bases proximate causation in suicide cases on the foreseeability of the decedent's suicide." However, the answer to the first part of the controlling question is that the plaintiff in any
medical-malpractice action, including medical-malpractice/wrongful-death actions against a psychiatrist resulting from the suicide of that psychiatrist's patient, must prove by substantial evidence that the psychiatrist breached the applicable standard of care and that that breach was a proximate cause of the patient's injuries.
The second part of the question certified by the trial court is whether Thompson met the burden of proof in this case regarding proximate cause. "`[I]t is well established that the question of proximate cause is almost always a question of fact. . . .'"Norris v. City of Montgomery, 821 So.2d 149, 155 n. 8 (Ala. 2001) (quoting Lemond Constr. Co. v. Wheeler,669 So.2d 855, 862 (Ala. 1995)). Pursuant to Rule 5, Ala. R.App. P., an interlocutory order should be certified for appeal when "the interlocutory order involves a controlling question oflaw as to which there is substantial ground for difference of opinion, that an immediate appeal from the order would materially advance the ultimate termination of the litigation, and that the appeal would avoid protracted litigation." "In other words, Rule 5 is not a vehicle by which to obtain review of `significant and unresolved factual issues.'"Gowens v. Tys. S., 948 So.2d 513, 530 (Ala. 2006) (quoting *Page 313 Spain v. Brown Williamson Tobacco Corp.,872 So.2d 101, 104 (Ala. 2003)) (emphasis added in Gowens). Accordingly, we decline to review whether Thompson has met the burden of proof regarding proximate cause.
 Summary
In summary, we answer the first part of the controlling question of law as follows: The plaintiff in a medical-malpractice action against a psychiatrist arising out of the suicide of the psychiatrist's patient must prove by substantial evidence that the psychiatrist breached the applicable standard of care and that the breach was a proximate cause of the patient's death. Accordingly, the trial court erred in concluding that Thompson had established proximate cause based simply on the duty analysis in Keebler andKeeton. We decline to address the factual question of whether Thompson met the burden of proof regarding proximate cause. Consequently, we reverse the judgment of the trial court and remand this case to the trial court for further proceedings.
REVERSED AND REMANDED.
HARWOOD, STUART, and PARKER, JJ., concur.
SEE, J., concurs in part in the rationale and concurs in the result.
NABERS, C.J., and LYONS, WOODALL, and SMITH, JJ., dissent.
[1] The AMLA provides that in any medical-malpractice action "the plaintiff shall have the burden of proving by substantial evidence" that the health-care provider failed to exercise the requisite care, skill, and diligence, § 6-5-548(a), and that "the minimum standard of proof required to test the sufficiency of the evidence to support any issue or fact shall be proof by substantial evidence." § 6-5-549. The legislature, in 1996, added the following sentence to § 6-5-549: "In the case of a jury trial, the jury shall be instructed that in order to return a verdict against a health care provider, the jury
shall be reasonably satisfied by substantial evidence
that the health care provider failed to comply with the standard of care and that such failure probably caused the injury or death in question." Act No. 96-511, § 3, Ala. Acts 1996 (emphasis added). A jury in a medical-malpractice case now must be instructed that it can return a verdict for the plaintiff only if the plaintiff has proven his case by substantial evidence. See Edgeworth v. Family Chiropractic HealthCtr., P.C., 940 So.2d 1011 (Ala. 2006) (discussing the 1996 amendment to the AMLA).