SMITH, Justice.
Marty Thompson, administrator of the estate of Peggy Sue Ellis, appeals from a judgment entered in favor of Dr. Rita W. Patton and her employer, Frank Kay Psychiatric Clinic (“the Clinic”). We affirm.
Facts and Procedural History
This is the second time this case has come before this Court. See Patton v. Thompson, 958 So.2d 303 (Ala.2006). The following facts and procedural history as summarized in Patton are relevant to this appeal:
“Peggy Sue Ellis suffered from and had been treated for a serious psychiatric illness for approximately 30 years when she was admitted to Baptist Medical Center Montclair (hereinafter ‘BMCM’) on November 11, 1999. She had previously been hospitalized for management of her psychiatric illness, and she had a history of suicide attempts. Before her November 11, 1999, admission, Ellis had been admitted three times to BMCM in 1999 for management of her psychiatric illness. Dr. Patton was Ellis’s physician during all of her admissions in 1999.
“Ellis was admitted to BMCM on November 11, 1999, following a suicide at *1131 tempt. Dr. Patton prescribed Seroquel, a psychotropic agent used to treat schizophrenia. Ellis was placed on a suicide watch in the hospital; the watch continued during her hospital stay. Her condition waxed and waned during her stay. Her condition regressed from November 18 to November 19, and the dosage of her medication was increased. On November 22, 1999, when Ellis was asked whether she would hurt herself, she replied ‘I hope not.’ That same day, Ellis stated that she was scared and worried, and she showed signs of paranoia and unreasonable fears regarding her family. She also stated that she was anxious about being discharged the next day.
“Ellis was discharged on November 23, 1999, with a discharge plan formulated by Dr. Patton. The plan included: (1) a follow-up appointment with Ellis’s therapist at the Eastside Mental Health Center for the next morning; (2) arrangements for daily visits by a home-health psychiatric nurse to monitor Ellis’s mental state and to monitor compliance with the prescribed medication; and (3) help from Ellis’s cousin in monitoring compliance with the prescribed medication.
“On November 24, 1999, Ellis went to the Eastside Mental Health Center, where she was evaluated by her therapist. The therapist noted that Ellis had been unable to fill her prescription for Seroquel and that she was confused about her medications, obsessed with psychotic thoughts, and frightened and that she had an ‘inappropriate and blunted affect.’ Dr. Patton was unaware that Ellis had not been able, to fill her prescription. On November 26, 1999, Ellis was found dead in her apartment of a drug overdose. The coroner determined that the manner of death was suicide. At the time of her death, Ellis was 53 years old.
“On November 19, 2001, Marty Thompson, as administrator of Ellis’s estate, sued Dr. Patton and the Clinic, alleging wrongful death under the Alabama Medical Liability Act, § 6-5-480 et seq. and § 6-5-541 et seq., Ala.Code 1975 (‘the AMLA’). Thompson alleged that Dr. Patton had breached the standard of care by discharging Ellis from the hospital prematurely, failing to formulate an appropriate outpatient-treatment plan, failing to readmit Ellis to a psychiatric unit, and failing to implement proper suicide precautions.
“At trial on March 19, 2004, Dr. Nathan Strahl, a psychiatrist, testified as an expert witness for Thompson.[1] ...
[[Image here]]
“Dr. Patton and the Clinic moved for a judgment as a matter of law at the close of Thompson’s case, which the trial court denied. Dr. Patton and Dr. Joseph Lucas, a psychiatrist, testified for the defense. Dr. Patton and the Clinic again moved for a judgment as a matter of law at the conclusion of all the evidence. The trial court denied the motion. The jury was unable to reach a verdict, and the trial court declared a mistrial. Dr. Patton and the Clinic filed a motion entitled ‘Defendants’ Rule 50(b)[, Ala. R. Civ. P.,] Renewed Motion for a Judgment as a Matter of Law, or, Alternatively Styled, Motion for a Summary Judgment.’ In that motion, they argued that Thompson failed to meet his burden of producing sufficient evidence to prove that Dr. Patton’s alleged negligence was the proximate cause of Ellis’s *1132 death. The trial court denied the motion
958 So.2d at 304-06.
In its order denying Dr. Patton and the Clinic’s motion, the trial court concluded “ ‘that [Thompson] has proffered sufficient evidence that a genuine issue of material fact exists, so as to allow this case to proceed to trial.’ ” 958 So.2d at 306. Relying on the decisions of this Court in Keeton v. Fayette County, 558 So.2d 884 (Ala.1989), and Keebler v. Winfield Carraway Hospital, 531 So.2d 841 (Ala.1988), the trial court held that Thompson’s evidence regarding the foreseeability of Ellis’s suicide was also sufficient to create a genuine issue of fact as to whether Dr. Patton’s alleged negligence proximately caused Ellis’s death. Patton, 958 So.2d at 306. The trial court then certified, for a permissive appeal to this Court under Rule 5, Ala. R.App. P., the following controlling question of law:
“ ‘The controlling question of law is the degree of proof necessary to establish the essential element of proximate causation in a medical malpractice/wrongful death action against a psychiatrist for the suicide of that psychiatrist’s patient and whether the plaintiff in this case has met that requisite degree of proof.’ ”
958 So.2d at 304.
In Patton, this Court noted that “the record supported] the trial court’s findings in its order that Dr. Patton knew that Ellis had suicidal proclivities and that she was aware that Ellis had manifested suicidal proclivities during her last hospitalization,” and Thompson argued that “he [had] established proximate cause by presenting evidence of Ellis’s suicidal proclivities, in accordance with Keebler.” 958 So.2d at 311. However, this Court stated that Thompson’s reliance on Keebler and Keeton was misplaced, because those decisions addressed “the duty owed, based upon the presence or absence of the foreseeability of suicide, rather than the proximate-causation issue presented by the trial court in the controlling question here.” Patton, 958 So.2d at 309 (emphasis added). Accordingly, this Court concluded:
“The trial court in its order denying the defendants’ motion for a judgment as a matter of law blurred the distinction between the different elements necessary to establish medical malpractice when it stated, based on Keebler and Keeton: ‘Alabama law bases proximate causation in suicide cases on the foreseeability of the decedent’s suicide.’ However, the answer to the first part of the controlling question is that the plaintiff in any medical-malpractice action, including medical-malpractice/wrongful-death actions against a psychiatrist resulting from the suicide of that psychiatrist’s patient, must prove by substantial evidence that the psychiatrist breached the applicable standard of care and that that breach was a proximate cause of the patient’s injuries.”
958 So.2d at 312.
Noting that “ ‘ “the question of proximate cause is almost always a question of fact,” ’ ” however, this Court refused to answer that part of the question certified by the trial court asking “whether Thompson met the burden of proof in this case regarding proximate cause.” 958 So.2d at 312 (quoting Norris v. City of Montgomery, 821 So.2d 149, 155 (Ala.2001), quoting in turn Lemond Constr. Co. v. Wheeler, 669 So.2d 855, 862 (Ala.1995)). This Court stated that “ ‘Rule 5[, Ala. R.App. P.,] is not a vehicle by which to obtain review of “significant and unresolved factual issues.” ’ ” 958 So.2d at 312 (quoting Gowens v. Tys. S., 948 So.2d 513, 530 (Ala.2006), quoting in turn Spain v. Brown & Williamson Tobacco Corp., 872 So.2d 101, *1133 104 (Ala.2003) (emphasis added in Gowens)).
After this Court’s decision in Patton, Dr. Patton and the Clinic filed another motion entitled “Rule 50(b) Renewed Motion for Judgment as a Matter of Law or, Alternatively Styled, Motion for Summary Judgment.” Dr. Patton and the Clinic again argued that Thompson had failed to offer sufficient evidence of proximate cause.
The trial court granted Dr. Patton and the Clinic’s motion and entered a judgment against Thompson on June 26, 2007. The trial court held that expert testimony was required to establish proximate causation in Thompson’s case because, the trial court held, the issue was “beyond the ken of the layman in his common knowledge and experience.” The trial court concluded that the expert testimony of Dr. Nathan Strahl, the psychiatrist who testified as Thompson’s expert witness, was not substantial evidence suggesting that Dr. Patton’s alleged negligence probably caused Ellis’s suicide.
Thompson timely appealed to this Court.

Standard of Review

The trial court, in its order granting Dr. Patton and the Clinic’s motion, did not state whether it was treating the motion as a renewed motion for a judgment as a matter of law under Rule 50(b), Ala. R. Civ. P., or as a motion for a summary judgment under Rule 56, Ala. R. Civ. P. In either case, our review of the sufficiency of the evidence of proximate causation, as well as the trial court’s application of law in making its causation determinations, is de novo. See Leiser v. Raymond R. Fletcher, M.D., P.C., 978 So.2d 700, 705-06 (Ala.2007), in which this Court quoted the following from Waddell & Reed, Inc. v. United Investors Life Insurance Co., 875 So.2d 1143, 1152 (Ala.2003):
“ ‘When reviewing a ruling on a motion for a [judgment as a matter of law], this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a [judgment as a matter of law]. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a [judgment as a matter of law]. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a [judgment as a matter of law], this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id.’ ”
See also Parrish v. Blazer Fin. Servs., Inc., 868 So.2d 406, 409 (Ala.2003) (de novo review of a summary judgment); Driver v. National Sec. Fire & Cas. Co., 658 So.2d 390, 392 (Ala.1995) (de novo review of a directed verdict/judgment as a matter of law); Alfa Life Ins. Co. v. Hughes, 861 So.2d 1088, 1094 (Ala.2003) (de novo review of the trial court’s application of legal standards in reaching its decision).

Discussion

I.

Thompson first argues that the expert testimony of Dr. Strahl provided substantial evidence that Dr. Patton’s alleged *1134 negligence in discharging Ellis from the hospital proximately caused Ellis to commit suicide.
In Patton, this Court stated:
“[Thompson] must prove, generally through expert testimony, that there was an applicable standard of care, that Dr. Patton breached that standard, and that the breach was a proximate cause of Ellis’s injuries. Lyons v. Walker Reg’l Med. Ctr., 791 So.2d 937 (Ala.2000).1 With regard to proximate cause, this Court has stated:
“ ‘A plaintiff in a medical-malpractice action must also present expert testimony establishing a causal connection between the defendant’s act or omission constituting the alleged breach and the injury suffered by the plaintiff. Pruitt v. Zeiger, 590 So.2d 236, 238 (Ala.1991). See also Bradley v. Miller, 878 So.2d 262, 266 (Ala.2003); University of Alabama Health Servs. Found., P.C. v. Bush, 638 So.2d 794, 802 (Ala.1994); and Bradford v. McGee, 534 So.2d 1076, 1079 (Ala.1988). To prove causation in a medical-malpractice action, the plaintiff must demonstrate “ ‘that the alleged negligence probably caused, rather than only possibly caused, the plaintiffs injury.’ ” Bradley, 878 So.2d at 266 (quoting University of Alabama Health Servs., 638 So.2d at 802). See also DCH Healthcare Auth. v. Duckworth, 883 So.2d 1214, 1217 (Ala.2003) (“ ‘There must be more than the mere possibility that the negligence complained of probably caused the injury.’ ” (quoting Parker v. Collins, 605 So.2d 824, 826 (Ala.1992))); and Pendarvis v. Pennington, 521 So.2d 969, 970 (Ala.1988) (“ ‘The rule in medical malpractice cases is that to find liability, there must be more than a mere possibility among others that the negligence complained of caused the injury; there must be evidence that the negligence probably caused the injury.’ ” (quoting Williams v. Bhoopathi, 474 So.2d 690, 691 (Ala.1985), and citing Baker v. Chastain, 389 So.2d 932 (Ala.1980))).’
“Sorrell v. King, 946 So.2d 854, 862 (Ala.2006).
"1 The [Alabama Medical Liability Act, § 6-5-480 et seq. and § 6-5-541 et seq., Ala.Code 1975 ('the AMLA') ] provides that in any medical-malpractice action 'the plaintiff shall have the burden of proving by substantial evidence' that the health-care provider failed to exercise the requisite care, skill, and diligence, § 6-5-548(a), and that 'the minimum standard of proof required to test the sufficiency of the evidence to support any issue or fact shall be proof by substantial evidence.' § 6-5-549. The legislature, in 1996, added the following sentence to § 6-5-549: 'In the case of a jury trial, the jury shall be instructed that in order to return a verdict against a health care provider, the jury shall be reasonably satisfied by substantial evidence that the health care provider failed to comply with the standard of care and that such failure probably caused the injury or death in question.’ Act No. 96-511, § 3, Ala. Acts 1996 (emphasis added). A jury in a medical-malpractice case now must be instructed that it can return a verdict for the plaintiff only if the plaintiff has proven his case by substantial evidence. See Edgeworth v. Family Chiropractic & Health Ctr., P.C., 940 So.2d 1011 (Ala.2006) (discussing the 1996 amendment to the AMLA).”
Patton, 958 So.2d at 311-12.
Thompson cites the following from Dr. Strahl’s testimony at trial:
“Q. ... In your opinion, given your review of the records and your understanding of Ms. Ellis’s condition on 11/23/99, was there a probability that she would attempt suicide or self harm if she was released from the hospital?
[[Image here]]
“A. That was a probability. The probability increases the more factors *1135 that she would carry leaving the hospital that are risk factors for suicide.
“Q. And did Ms. Ellis possess many of these risk factors?
“A. She did.
“Q. Was it highly probable?
“A. It was highly probable that she might do something to herself, yes.
“Q. Doctor, in your opinion, should a treating psychiatrist, given what we know and what you have reviewed about Ms. Ellis, exercising reasonable care, diligence and skill have recognized this probability that you just testified to?
“A. I would think so, yes, sir.
[[Image here]]
“Q. I think you just answered my next question, but I want to ask it so the record is clear. Strictly concerning this discharge which you have criticized today, given the facts and circumstances that you’re aware of in Ms. Ellis’s condition on 11/22/99, what would be the standard of care or what would the standard of care have dictated on the date concerning discharge?
“A. In my medical opinion, with the night before, the statements about ‘I hope so,’ reservations about not being suicidal, the continued psychotic features, I would be very concerned about discharge. Usually, the record shows some anxiety typically prior to discharge. I would not count that as a negative factor. Most patients would have some anxiety about leaving. But here we’re having clear indication of psychotic symptoms and concerns that she voiced last night about being able to take care of herself in terms of safety. I think based on those two things, hospitalization [sic] is a bit premature.
“Q. Doctor, did Ms. Ellis’s discharge fall below the recognized standard of care for a psychiatrist?
“A. In my medical opinion, it did.
[[Image here]]
“Q. Doctor, do you have an opinion as to whether suicide was an eminent potential given Ms. Ellis’s release on November 2S, 1999?
“A. Yes.
“Q. And what is that opinion?
“A. That it was.”
Thompson contends that that testimony provides substantial evidence indicating that Dr. Patton’s alleged negligence in releasing Ellis from the hospital proximately caused her to commit suicide. We disagree.
At most, Dr. Strahl’s testimony is substantial evidence indicating that when Ellis was discharged from the hospital on November 23, 1999, it was reasonably foreseeable to Dr. Patton that there was a “probability” that Ellis “would attempt suicide or self harm” or that it was “highly probable that she might do something to herself’ or that suicide was “an eminent potential.” That evidence, along with Dr. Strahl’s testimony that Dr. Patton’s decision to discharge Ellis fell below the standard of care, creates a question of fact as to whether Dr. Patton breached the standard of care.
That evidence, however, shows only that there was a unquantitative probability that Ellis might possibly attempt suicide or self harm. Under Alabama law, evidence showing only a probability of a possibility is not sufficient to establish proximate causation in a negligence action alleging medical malpractice. See Levesque v. Regional Med. Ctr. Bd., 612 So.2d 445, 448 (Ala.1993) (quoting Hannon v. Duncan, 594 So.2d 85, 91 (Ala.1992) (“ ‘The rule of our cases in malpractice suits is that there must be something more than a mere possibility — something more than one possibility among others— *1136 that the negligence complained of was the cause of the injury. There must be some evidence to the effect that such negligence probably caused the injury-’ ”)).
In Levesque, a plaintiff in a medical-malpractice action contended that the defendant doctor had acted negligently in delivering the plaintiffs child at birth, which, the plaintiff alleged, caused the child to suffer injuries. As to the element of proximate causation, this Court noted:
“The plaintiff asserts that certain testimony by Dr. Engel, one of her experts, establishes the proximate causation element. She specifically relies on the following exchange between her attorney and Dr. Engel in an offer of proof:
“ ‘Q. The question, Dr. Engel, would be: Based on your education, training, and experience, would you describe to us if you have an opinion as to a reasonable medical certainty that could generalized seizure disorders be caused by the actions or inac-tions of Dr. Victoria during the labor and delivery of [the child] based on ... the criticisms that you told us about in relationship to your opinions in the delivery of [the child]?
“‘A. I believe in — the answer is yes. In all medical probability.’
“(Emphasis added.) The ensuing questions concerning [the child’s] conditions of hemiparesis and optic nerve hypopla-sia were phrased in exactly the same manner; Dr. Engel responded ‘yes, in all medical probability’ to each of the questions.”
612 So.2d at 448. This Court in Levesque stated that, even assuming that Dr. Engel was
“qualified as an expert on the causation issue, the plaintiffs claim would still fail, because Dr. Engel was unable to testify that acts or omissions of Dr. Victoria probably caused Anthony’s injuries. The questions posed to Dr. Engel elicited only the answer that Dr. Victoria’s actions probably could have caused the injuries; this answer falls short when measured by the standard by which evidence of proximate causation is tested.”[2]
612 So.2d at 449.[3]
In the present case, Dr. Strahl’s testimony quoted above does not suggest *1137 that Dr. Patton’s decision to discharge Ellis probably caused Ellis to commit suicide. Dr. Strahl’s testimony does not suggest “a causal connection between [Dr. Patton’s] act or omission constituting the alleged breach and the injury suffered by [Ellis.]” Sorrell v. King, 946 So.2d 854, 862 (Ala.2006) (emphasis added). His testimony does not suggest that Dr. Patton’s alleged negligence “probably caused, rather than only possibly caused, the plaintiffs injury” or that there is anything “more than the mere possibility that the negligence complained of probably caused the injury.” Sorrell, 946 So.2d at 862 (quotation marks and citations omitted). Although Dr. Strahl’s testimony is evidence indicating that Dr. Patton’s alleged negligence in discharging Ellis could have possibly caused Ellis’s suicide, evidence that a health-care provider’s alleged negligence possibly caused an injury is not substantial evidence of proximate causation under Alabama law. Sorrell, 946 So.2d at 862; Levesque, 612 So.2d at 448-49.[4]
Thompson next cites the following from Dr. Strahl’s testimony at trial:
“Q: Doctor, do you have an opinion as to whether the early release of Peggy Sue Ellis by Dr. Patton was the proximate cause of her death?
“A: Well, certainly.”
At that point in Dr. Strahl’s testimony, counsel for Dr. Patton and the Clinic objected on the basis that the testimony “invade[d] the province of the jury,” and the trial court sustained that objection. Later in Dr. Strahl’s testimony, the following exchange occurred:
“Q. And do you have an opinion about whether her release directly led [to] and caused her death?
“A. Yes, Ido.
“Q. And what is that opinion?
“[Counsel for Dr. Patton and the Clinic]: Excuse me. I believe that invades the province of the jury as well, Your Honor. I object.
“THE COURT: What was the question?
“(Record read.)
“THE COURT: I’ll sustain based on the way the question was asked.”
Thompson asserts that Dr. Patton and the Clinic “invited error by objecting to direct questioning of Dr. Strahl concerning causation,” because, Thompson contends, “[e]xperts are permitted to draw conclusions regarding causation.” Dr. Patton and the Clinic, however, argue that the doctrine of invited error is inapplicable.
As Dr. Patton and the Clinic point out, the doctrine of invited error “provides that a party may not complain of error into which he has led the court.” Ex parte King, 643 So.2d 1364, 1366 (Ala.1993)(citing Aetna Life Ins. Co. v. Beasley, 272 Ala. 153, 157, 130 So.2d 178, 182 (1961)). In the present case, the parties alleged to have invited the error (Dr. Patton and the Clinic) are not seeking to have the judgment of the trial court reversed on the *1138 basis of that alleged error; instead, it is Thompson who argues that the trial court erred. Consequently, the doctrine of invited error is not applicable against Dr. Patton and the Clinic in the present case.
Additionally, we agree with Dr. Patton and the Clinic’s contention that, because Thompson made no offer of proof as to the substance of what Dr. Strahl’s testimony would have been regarding proximate. cause, Thompson did not preserve for appellate review the alleged error in sustaining Dr. Patton and the Clinic’s objection to the question calling for Dr. Strahl’s opinion as to “whether [Ellis’s] release directly led [to] and caused her death.” Rule 103(a)(2), Ala. R. Evid., states:
“(a) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
[[Image here]]
“(2) Offer of Proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.”
Thus, when an objection has been sustained, the party attempting to offer the evidence generally must make an offer of proof in order to seek appellate review of the trial court’s ruling. See also K.W. v. J.G., 856 So.2d 859, 869 (Ala.Civ.App.2003), in which the Court of Civil Appeals stated:
“Additionally, the mother did not attempt to make any offer of proof regarding the testimony that she now contends was limited by the trial court. See Charles W. Gamble, McElroy’s Alabama Evidence § 425.01(1) (5th ed. 1996) (‘The party offering the evidence, to which an objection has been sustained, must make an offer of proof as a condition precedent to appellate review.’ (footnote omitted)). See also Strickland v. Mobile Asphalt Co., 650 So.2d 893, 894 (Ala.Civ.App.1994) (‘The failure to make such an offer of proof resulted in a failure to preserve any error for our review.’). The mother has made no argument that objecting before the trial court or making an offer of proof would have been a ‘useless gesture.’ See Killingsworth v. Killingsworth, 283 Ala. 345, 354, 217 So.2d 57, 66 (1968).”
Thompson did not make an offer of proof to the trial court as to what Dr. Strahl’s testimony would have been regarding proximate causation. Consequently, nothing in the record before us indicates what Dr. Strahl’s opinion as to causation would have been.
In his reply brief to this Court, Thompson quotes material from Dr. Strahl’s deposition in an attempt to demonstrate what Dr. Strahl’s testimony as to proximate causation would have been. However, because Dr. Strahl’s deposition testimony is not a part of the record on appeal, Dr. Patton and the Clinic have moved to strike the portions of Thompson’s reply brief referencing and quoting portions of Dr. Strahl’s deposition testimony, as well as the arguments founded on that testimony. In Green v. Standard Fire Insurance Co. of Alabama, 398 So.2d 671, 673 (Ala.1981), this Court noted:
“[I]t- is well settled in Alabama that an appellate court will not consider matters outside the record. American Benefit Life Insurance Co. v. Ussery, Ala., 373 So.2d 824 (1979). This Court is limited to a review of the record alone and ‘the record cannot be changed, altered or varied on appeal by statements in briefs of counsel, nor by affidavits or other evidence not appearing in the record.’ *1139 Cooper v. Adams, 295 Ala. 58, 322 So.2d 706 (1975).”
We therefore grant Dr. Patton and the Clinic’s motion to strike and do not consider the portions of Dr. Strahl’s deposition that Thompson quotes in his reply brief. Thompson thus has not preserved for appellate review the issue whether the trial court erred in sustaining Dr. Patton and the Clinic’s objection to Dr. Strahl’s testimony regarding proximate causation.
Finally, Thompson notes that Dr. Patton, in her testimony, agreed with the statement “that had [Ellis] been hospitalized, the likelihood of her committing suicide would have been lessened,” and Thompson contends that Dr. Patton’s testimony in that regard is expert testimony providing sufficient proof of proximate causation. We disagree.
The testimony of Dr. Patton’s to which Thompson cites was as follows:
“Q. Let’s put it another way. If [Ellis had been admitted to the hospital on November 24], more than likely or probably, she would not have committed suicide on the 25th or 26th?
“A. If she was hospitalized, there would have been certainly a less likelihood if she was in the hospital.
“Q. Well, is it a less likelihood or would you consider that a probability?
“A. There would be a less likelihood. People have committed suicide in hospitals even under the best of care.”
(Emphasis added.) Dr. Patton’s testimony in that regard indicates that continued hospitalization would have made it less likely that Ellis would have committed suicide, but it does not provide substantial evidence indicating that Dr. Patton’s decision to discharge Ellis probably caused her death.

II.

Thompson next argues that expert testimony was not required to establish proximate causation in the present case. After citing portions of the above-quoted testimony in which Dr. Strahl opined that Dr. Patton’s decision to discharge Ellis fell below the applicable standard of care, Thompson argues: “Any layperson weighing this testimony along with both Dr. Strahl and Dr. Patton’s testimony regarding [Ellis’s] suicidal history/[5] can reliably determine the issue of causation without expert testimony to assist in that determination.” We disagree.
In Ex parte HealthSouth Corp., 851 So.2d 33 (Ala.2002), this Court affirmed the holding of the Court of Civil Appeals “that expert testimony was not needed to prove that HealthSouth [Corporation] breached its duty of care to Heath [the plaintiff] when its nursing staff allegedly failed to respond to her calls for assistance, which failure proximately caused Heath’s injuries.” 851 So.2d at 36. HealthSouth argued that Heath was required to present expert testimony because the facts of her case did not fit within one of the four categories of cases identified in Anderson v. Alabama Reference Laboratories, 778 So.2d 806 (Ala.2000), as exceptions to the expert-testimony requirement in a medical-malpractice action. The four categories stated in Anderson were as follows:
“ ‘ “ T) where a foreign instrumentality is found in the plaintiffs body following surgery; 2) where the injury complained of is in no way connected to the condition for which the plaintiff *1140 sought treatment; 3) where the plaintiff employs a recognized standard or authoritative medical text or treatise to prove what is or is not proper practice; and 4) where the plaintiff is himself or herself a medical expert qualified to evaluate the doctor’s allegedly negligent conduct.’ ”
“ ‘Allred [v. Shirley], 598 So.2d [1347,] at 1350 [(Ala.1992)] (quoting Holt v. Godsil, 447 So.2d 191, 192-93 (Ala.1984) (citations omitted in Allred)).’ ”
Ex parte HealthSouth, 851 So.2d at 37 (quoting Anderson, 778 So.2d at 811).
This Court rejected HealthSouth’s argument, however, concluding that the list of categories in Anderson was illustrative, not exclusive. 851 So.2d at 38. Consequently, the Court in Ex parte Health-South reformulated the statement of the exceptions to the general rule requiring expert testimony. 851 So.2d at 38. Thompson contends that this case falls within the first exception stated in Ex parte HealthSouth, which is
“when the act or omission is in a class of cases ‘ “where want of skill or lack of care is so apparent ... as to be understood by a layman, and requires only common knowledge and experience to understand it,” ’ [Tuscaloosa Orthopedic Appliance Co. v.] Wyatt, 460 So.2d [156,] at 161 [ (Ala.1984) ] (quoting Dimoff v. Maitre, 432 So.2d 1225, 1226-27 (Ala.1983)), such as when a foreign object is left in, the wrong body part is operated on, or a call for assistance is ignored for an unreasonable time .... ”
851 So.2d at 42.
This Court concluded that the situation in Ex parte HealthSouth — a nurse failed to respond to a routine call within a 30-minute period — was within that exception. This Court rejected HealthSouth’s contention “that allowing ‘patient monitoring standards’ to be within a layperson’s ‘common knowledge’ opens the door for cases that should be evaluated as medical-malpractice cases to be treated as simple negligence cases.” 851 So.2d at 40. HealthSouth specifically raised the following scenarios as illustrative of “ ‘factually complex decisions’ that would then be submitted to juries without the requisite assistance from medical experts”:
“ ‘What if there is an emergency on the floor? What if the call light is not working or is improperly used by the patient? And, if an alleged thirty-minute delay is somehow within the understanding of laypeople for purposes of assessing liability, what then of fifteen minutes? Or five? Or one? ... [W]hat about issues of causation, such as where, as here, HealthSouth’s expert testified that the plaintiffs own conduct (i.e., failing to follow her physician’s orders about not getting out of bed) was the actual cause of the injury?’ ”
851 So.2d at 40-41. This Court concluded:
“A layperson does not need an expert to assist him or her in understanding that an emergency on the floor could cause a delay or that a one-minute delay could be reasonable, for example, when the nurses’ desk is two minutes from the patient’s room. As to causation, it is clear that Heath’s injuries occurred because she got out of the hospital bed and fell. A jury can certainly weigh the facts in determining causation, be they a nurse’s failure to respond within a 30-minute time frame or a doctor’s order to stay in bed. We do not see why a medical expert would be necessary to establish that Heath’s failure to follow doctor’s orders — by getting out of bed and injuring herself — was the result of the failure to respond to a call for assistance for an unreasonable period. In this case, where the issue is whether a nurse breached the standard of care by *1141 not responding to a routine call within a 30-minute period, laypersons could answer all of the aforementioned hypothetical by using their ‘common knowledge and experience.’ We do not see how an expert would be necessary to testify as to the ‘medical standards’ involved.”
851 So.2d at 41.
Relevant to the resolution of the present case is this Court’s conclusion in Ex parte HealthSouth that “the nurse’s responsibility to respond to Heath’s call for assistance clearly [fell] within the category of routine hospital care”; that “routine hospital care” involved custodial care rather than medical care, and, consequently, “[a] jury could use ‘common knowledge and experience’ to determine whether the standard of care was breached.” 851 So.2d at 39. See also Ex parte HealthSouth, 851 So.2d at 42-43 (See, J., concurring specially) (“I concur with the majority’s decision to affirm the judgment of the Court of Civil Appeals because the Heaths’ claim on which that court reversed the summary judgment does not appear to be a medical-malpractice claim, but is instead a claim alleging negligent or wanton-and-willful failure to provide requested custodial care. Because, and to the extent that, the Heaths’ claims are not medical-malpractice claims, I concur that the Heaths need not show the applicable standard of care through expert medical testimony.”).
Unlike the alleged negligence at issue in Ex parte HealthSouth, the underlying issue here does not involve a matter of “routine hospital care.” Dr. Patton’s decision to discharge Ellis from the hospital was one of a number of decisions she made about the appropriate medical care for treating Ellis’s psychiatric illness. For example, the decision to discharge Ellis from the hospital was accompanied by a discharge plan created by Dr. Patton. Dr. Patton and the Clinic provide the following summary of Ellis’s discharge plan and treatment:
“Ms. Ellis was discharged with the following discharge plan formulated by Dr. Patton: (1) a follow-up appointment was scheduled for the following morning with Ms. Ellis’s long-time counselor at the Mental Health Center; (2) arrangements were made for daily visits by a home-health psychiatric nurse to monitor Ms. Ellis’s mental state and monitor medication compliance; and (3) a commitment was obtained from Ms. Ellis’s cousin to assist Ms. Ellis with medication compliance. Additionally, during the hospitalization, Ms. Ellis’s medications were adjusted and she was discharged with an increased dosage of Se-roquel. This discharge plan was unique and different from other discharge plans formulated for Ms. Ellis in the past in that it included many new interventions that had not been a part of previous discharge plans. The undisputed testimony at trial from all three psychiatrists who testified, including [Thompson’s] expert witness, was that this was an excellent discharge plan that met the standard of care.”
Dr. Patton and the Clinic’s brief, pp. 8-9 (footnote and citations omitted).
The decision to discharge Ellis thus was accompanied by a number of additional medical determinations. Deciding whether Dr. Patton’s decision to discharge Ellis probably caused Ellis to commit suicide includes evaluating the reasonableness of that decision in light of the other medical determinations accompanying it. Evaluating the reasonableness of medical decisions is not a matter for which “[a] jury could use ‘common knowledge and experience.’ ” Ex parte HealthSouth, 851 So.2d at 39.
We note that other jurisdictions have also found that in medical-malpractice cases involving suicide, expert testimony is *1142 required to establish that the alleged breach of the standard of care proximately caused the suicide. See, e.g., Wilkins v. Lamoille County Mental Health Servs., 179 Vt. 107, 116-17, 889 A.2d 245, 252-53 (2005), in which the Supreme Court of Vermont stated:
“Plaintiffs case rests squarely on the allegation expressed in her complaint that defendant’s negligence ‘in treating [decedent’s] suicidal condition’ proximately caused her death. We have repeatedly held that the standard-of-care and causation elements of professional negligence claims ‘[o]rdinarily ... must be proved by expert testimony,’ Jones v. Block, 171 Vt. 569, 569, 762 A.2d 846, 848 (2000) (mem.), and this is no less true of claims relating to the negligent treatment or assessment of patients at risk of committing suicide. See, e.g., Dimitrijevic v. Chi. Wesley Mem’l Hosp., 92 Ill.App.2d 251, 236 N.E.2d 309, 313 (1968) ... Moats v. Preston County Comm’n, 206 W.Va. 8, 521 S.E.2d 180, 188 (1999) (determining whether mental health center’s negligence caused suicide ‘involves complicated medical issues, specifically, the manner and method of protecting someone who is suicidal,’ that are not within knowledge of lay jurors); see also Estate of Joshua T. v. State, 150 N.H. 405, 840 A.2d 768, 772 (2003) (holding that because ‘[s]uicide is not easily explained or understood’ and ‘[fits causes, prevention, triggers and warning signs cannot be readily calculated,’ expert testimony is required to establish causal link between suicide and alleged negligence in placing decedent in foster home).
“Plaintiffs claim that defendant deviated from the standard of care by prematurely evaluating decedent while she was still feeling the effects of the overdose; failing to conduct a sufficient suicide-risk evaluation, including the risk posed by firearms; failing to require a written safety contract; and failing to schedule follow-up appointments, together with the claim that such conduct was the proximate cause of decedent’s suicide, all involve complex psychiatric/medical issues relating to the causes, warning signs, and prevention of suicide. These are plainly not issues within a lay juror’s common knowledge and experience. See Estate of Fleming v. Nicholson, 168 Vt. 495, 497-98, 724 A.2d 1026, 1028 (1998) (expert testimony not required ‘[w]here a professional’s lack of care is so apparent that only common knowledge and experience are needed to comprehend it’).”
The issue of proximate causation in this case was not an issue that could be determined without expert testimony.

Conclusion

The judgment of the trial court is affirmed.
MOTION TO STRIKE GRANTED; AFFIRMED.
SEE, LYONS, WOODALL, STUART, BOLIN, and PARKER, JJ., concur.
COBB, C.J., and MURDOCK, J., concur in the result.

. Relevant portions of Dr. Strahl's testimony are reproduced later in this opinion.

. In his special writing concurring in the result, Justice Murdock asserts that, by reading Dr. Strahl’s opinion that "[i]t was highly probable that [Ellis] might do something to herself” to mean what it literally says (i.e., that it was highly probable that Ellis might do something to herself), we are imposing too strict "a standard of precision in the oral use of the English language,” 6 So.3d at 1143 a standard he contends is neither appropriate nor required as a matter of law. However, Levesque, which like the present case involved an expert’s oral testimony, illustrates that there is an important legal difference between testimony that the negligence complained of probably caused the injury and testimony that the negligence complained of probably could have or possibly caused the injury.
The expert’s testimony at issue in Giada v. Tucker, 746 So.2d 998 (Ala.1999), the primary case upon which Justice Murdock relies, was not that “it is most likely probable that blindness might not have occurred”; the testimony instead was " ‘it is most likely probable that blindness would not have occurred,’ ” 746 So.2d at 1000 (emphasis added). In the present case, however, the testimony from Dr. Strahl was not that ”[i]t was highly probable that [Ellis] would do something to herself”; rather, Dr. Strahl testified that "it was highly probable that [Ellis] might do something to herself” (emphasis added).

. Significantly, the scintilla rule of evidence applied in Levesque to test the sufficiency of evidence of proximate causation. Levesque, 612 So.2d at 448. In 1987, the legislature abolished the scintilla rule in actions filed after June 11, 1987, against health-care providers based on a breach of the standard care. § 6-5-549, Ala.Code 1975. The sufficiency of evidence in such actions against health-care providers filed after June 11, 1987, is tested *1137 by the substantial-evidence standard. § 6-5-549.

. As noted, the day after her discharge from the hospital, Ellis went to a mental-health center for treatment; at that time, Ellis had not filled her prescription for — and had missed two doses of — Seroquel, the medication Dr. Patton had prescribed for her. Dr. Patton was never informed that Ellis had been unable to fill her prescription. In addition to Dr. Strahl's failure to testify that Dr. Patton's alleged negligence probably caused Ellis's suicide, the trial court's order entering a judgment in favor of Dr. Patton and the Clinic noted that Dr. Strahl testified that those events occurring after Ellis's discharge from the hospital compounded any effect of Dr. Patton's decision to discharge Ellis from the hospital.

. There was testimony at trial that Ellis had been treated for approximately 30 years for a psychiatric illness and that, in the year before her death, she had been hospitalized more than once for management of that illness and had twice attempted suicide.